Timothy E. BROWN

v.

Otis R. BOWEN, Secretary of Health and Human Services.

Appeal of Otis R. BOWEN, Secretary of Health and Human Services.

No. 87–3659.

United States Court of Appeals, Third Circuit.

Argued March 3, 1988.

Decided May 2, 1988.

Beverly Dennis, III (argued), Chief Counsel, Region III, Charlotte Hardnett, Supervisory Asst. Regional Counsel, Patricia A. Heenan, Asst. Regional Counsel, Dept. of Health and Human Services, Philadelphia, Pa., J. Alan Johnson, U.S. Atty., Bonnie R. Schlueter, Asst. U.S. Atty., W.D. Pennsylvania, Pittsburgh, Pa., for appellant.

Timothy C. Andrews (argued), Marnie E. Abraham, Laurel Legal Services, Inc., Greenburg, Pa., for appellee.

Before SEITZ, HIGGINBOTHAM and COWEN, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

### I.

The Secretary of Health and Human Services ("HHS") appeals from a district court order awarding Timothy E. Brown disability benefits under the Supplemental Security Income program. The Secretary had previously found Brown to not be disabled under this program, and the district court order reversed the Secretary's determination. Because we conclude that the Secretary's original determination that Brown was not disabled was supported by substantial evidence, we reverse the order of the district court.

### II.

Timothy Brown is 21 years old. He attended school through the ninth grade as a special education student. He is borderline mentally retarded,[1] and suffers from an epileptic seizure disorder.[2] He claims that

---

1. There is some dispute regarding the degree of Brown's mental retardation. The record to this case reveals that IQ tests administered to Brown have produced disparate results. A 1974 Stanford–Binet test found Brown to have an IQ of 75, and a 1976 WICS test produced a score of 72. A 1980 test administered during a hospitalization for Brown's seizure disorder produced a verbal IQ of 60, a performance IQ of 55, and a full scale score of 54. Brown was again tested in June 4, 1984 by a psychologist, and found to have an WAIS scale verbal IQ of 75, a performance IQ of 94, and a full scale IQ of 82.

The ALJ who heard this case discredited the 1980 test as "inaccurate and unreliable" (Tr. 10), and the district court found that the ALJ's determination that Brown's mental retardation did not preclude substantial gainful activity was supported by substantial evidence. As Brown does not contest otherwise in this appeal, we proceed on the assumption that Brown's mental retardation, alone, is not sufficiently severe as to render him disabled.

2. The nature and severity of Brown's seizure disorder is also a matter of some dispute in this case. Brown contends that he experiences seizures of "grand mal" proportions more than once a month, and that this disorder is documented by EEG tests. The Secretary, while admitting that Brown suffers from a seizure disorder documented by EEG tests, disputes whether Brown's seizures are major motor seizures of "grand mal" proportions, and also disputes the frequency of Brown's seizures.

Because we conclude that Brown has not demonstrated that he experiences seizures despite his following prescribed anticonvulsive treatment, *see* section IV.A. *infra,* we need not resolve these disputes.

these conditions have rendered him disabled since September 22, 1979, and that he is thus entitled to disability insurance benefits under the SSI program.

Brown filed an application for SSI benefits on November 16, 1985.[3] His application was denied, both initially and on reconsideration, by the Office of Disability Operation of the Social Security Administration. These denials were predicated upon an initial finding, and a finding upon reconsideration of the Pennsylvania State Agency that Brown was not disabled within the meaning of the Social Security Act (the "Act"). The state agency considered reports submitted by physicians and disability examiners.

Brown's case was considered *de novo* by an administrative law judge ("ALJ"), who held a hearing on June 12, 1986. The claimant was represented by an attorney at the hearing, and presented his own testimony and the testimony of his stepfather. The ALJ also considered a variety of psychological, medical and hospital reports, and other evidence. The ALJ concluded that Brown's seizure disorder did not meet the relevant "listing" in the Secretary's regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.02 (epilepsy) (1987), and also found that Brown retained the ability to engage in gainful employment existing in the national economy. He thus found him not to be disabled. Brown appealed the ALJ's decision, and on September 19, 1986, the Appeals Council denied Brown's appeal.

Brown then filed an action in the United States District Court for the Western District of Pennsylvania seeking review of the Secretary's decision pursuant to 42 U.S.C. § 1383(c)(3) (1982). The district judge, by memorandum and order dated June 26, 1987, found that the Secretary's determination that Brown's mental retardation did not render him disabled was supported by substantial evidence, but that his determination that Brown's seizure disorder did not meet the applicable "listing" was not supported by substantial evidence. The district court also found that the Secretary failed to examine Brown's nonexertional limitations before denying benefits. The court thus entered judgment in favor of Brown. The Secretary appeals to this Court.

## III.

Our standard of review in this case is whether there is substantial evidence in the record to support the Secretary's decision. *Stunkard v. Secretary of Health and Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir.1986). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). It is more than a mere scintilla of evidence but may be less than a preponderance. *Stunkard*, 841 F.2d at 59.

█ A person seeking Social Security (or SSI) disability benefits must demonstrate that he suffers from "an impairment that prevents him from engaging in 'any substantial gainful activity' for a statutory twelve-month period." *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir.1987) (quoting 42 U.S.C. § 423(d)(1) (1982)). He must show that there is a medically determinable basis for the impairment. *Kangas*, 823 F.2d at 777.

A claimant may make such a showing in one of two ways. First, he can introduce medical evidence that he suffers from one or more of the serious impairments delineated in 20 C.F.R. Part 404, Subpart P, Appendix 1 (1987). If he can demonstrate that he suffers from one of the "listed" impairments, he is considered disabled *per se*. *Kangas*, 823 F.2d at 777. Second, a claimant can demonstrate that although he does not suffer from a "listed" impairment, he has an impairment severe enough that

---

**3.** Brown had filed a prior application for disability benefits on April 19, 1985, which was denied through the ALJ hearing level. Brown did not appeal that ALJ's decision, but instead filed the present application before us for review.

he can not engage in any "substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

One seeking benefits under this second method must demonstrate the existence of a medically determinable disability that prevents him from returning to his former employment. Once a claimant has done this, "the burden shifts to the Secretary to demonstrate that given the claimant's age, education, and work experience, the claimant is capable of performing substantial gainful work activity in the national economy." *Stunkard*, 841 F.2d at 59. In order to demonstrate that the claimant is capable of performing such work, the Secretary must prove that the claimant retains the residual functional capacity to work on a "regular and continuing basis." *Id.* (quoting *Kangas*, 823 F.2d at 777). The Secretary must take into account exertional limitations, such as a claimant's ability to meet strength requirements for lifting, pushing, or pulling, 20 C.F.R. § 404.1545(b), and nonexertional limitations, which include both mental impairments, 20 C.F.R. § 404.1545(c), and others, such as sensory impairments, epilepsy, and postural and manipulative limitations. 20 C.F.R. § 404.1545(d).

## IV.

■ This case presents two distinct issues. The first is whether the Secretary's finding that Brown's seizure disorder does not meet the applicable "listing", 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.02 (epilepsy) was supported by substantial evidence. Since we determine that it was, we must also address whether the Secretary's finding that Brown retains the functional capacity to perform work existing in the national economy was supported by substantial evidence. We conclude that this finding, also, was supported by substantial evidence. We therefore reverse the district court order.

## A.

In order to meet the relevant "listing", 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.02 (epilepsy), Brown must demonstrate that he has major motor seizures ("grand mal"), documented by EEG and detailed description, at least once a month despite 3 months of prescribed treatment. The regulation, however, states that these criteria

can be applied only if the impairment persists despite the fact that the individual is following prescribed anticonvulsive treatment. Adherence to prescribed anticonvulsive therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy. Determination of blood levels of phenytoin sodium or other anticonvulsive drugs may serve to indicate whether the prescribed medication is being taken. When seizures are occurring at the frequency stated in 11.02 or 11.03, evaluation of the severity of the impairment must include consideration of the serum drug levels. Should serum drug levels appear therapeutically inadequate, consideration should be given as to whether this is caused by individual idiosyncrasy in absorbtion of metabolism [sic] of the drug. Blood drug levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance. When the reported blood drug levels are low, therefore, the information obtained from the treating source should include the physicians' statement as to why the levels are low and the results of any relevant diagnostic studies concerning the blood levels.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.00.

In this case, the record contains abundant evidence that Brown's blood drug levels were lower than therapeutic levels. From 1979 to October, 1984 Brown's seizure disorder was treated with two drugs, dilantin and phenobarbital. The therapeutic level of dilantin is 10—20 mcg/ml, and the therapeutic level of phenobarbital is 15—40 mcg/ml.[4] Here follows a list of testing dates and blood drug levels:

---

**4.** These therapeutic levels, and the levels *infra*    for Depokane and Tegretol are taken from the

| Date | dilantin | phenobarbital | |
|------|----------|---------------|---|
| 10/8/79 | 8.5 | | (Tr. 354) |
| 12/4/79 | 9.7 | 11.5 | (Tr. 353) |
| 9/17/84 | 10.4 | | (Tr. 344) |
| 10/2/84 | 22.5 | | (Tr. 340) |

The 10/2/84 level of dilantin apparently constituted an overdose, and Brown's medication was changed to Depakene (valproic acid) and Tegretol (carbamazepine). The therapeutic level of Depakene is 50–100 mcg/ml, and the therapeutic level of Tegretol is 8–12 mcg/ml. Testing dates and drug levels:

| Date | Depakene | Tegretol | |
|------|----------|----------|---|
| 10/15/84 | | 2.7 | (Tr. 337) |
| 10/27/84 | | 6.1 | (Tr. 334) |
| 10/31/84 | 41 | 5.9 | (Tr. 328) |
| 11/28/84 | 50 | 8.5 | (Tr. 325) |
| 12/12/84 | 42 | 12.2 | (Tr. 323) |
| 1/18/85 | 29 | 9.0 | (Tr. 320) |
| 4/1/85 | | 7.5 | (Tr. 315) |
| 5/7/85 | | 6.3 | (Tr. 312) |
| 6/15/85 | 57 | 11.0 | (Tr. 308) |
| 9/24/85 | | 7.9 | (Tr. 304) |
| 1/2/86 | 49 | 7.4 | (Tr. 363) |

It is our opinion that this record evidence is clearly sufficient to sustain the ALJ's conclusion that Brown's serum drug levels were therapeutically inadequate.[5] Brown has submitted no evidence, other than testimony that he takes his medication as prescribed, that these low blood drug levels are the result of an individual idiosyncrasy in absorption or metabolism of the drug. In fact, the evidence of record, including statements of Brown's treating physician, and the fact that his blood levels reached therapeutic levels during hospitalizations, would indicate that these low blood levels are the result of a failure to comply with the therapeutic regimen.[6] We therefore conclude that the Secretary's determination that Brown has not demonstrated compliance with his therapeutic regimen is supported by substantial evidence.

### B.

The Secretary also concluded that Brown retains the residual functional capacity to perform work existing in the national economy. In making this determination, the Secretary is of course obliged to consider non-exertional as well as exertional limitations. 20 C.F.R. § 404.1545.

In this case, the ALJ found that Brown was 20 years old, had no past relevant work history, finished 9 years of special education, and did not have any acquired, transferable job skills. Tr. 12. He determined that Brown suffered from no exertional limitations, but that his borderline mental retardation would prevent him from doing work which required him to comprehend and carry out complex instructions. Tr. 12. The ALJ also concluded that Brown's history of seizure activity would prevent him from being near moving machinery, and from working at unprotected heights. Tr. 12. The ALJ then applied the Secretary's regulations to these findings and determined that Brown had the residual functional capacity to perform work existing in the national economy. We can not say, given the testimonial and medical evidence in the record that this conclusion is not supported by substantial evidence.[7]

laboratory reports contained in the record of this case. While determining appropriate therapeutic levels of medication requires medical expertise, and particular levels for particular patients might be disputed, the record before the ALJ and the district judge, as far as we can determine, contains only the therapeutic levels stated on these laboratory reports.

5. We would note, however, that the Secretary may not have pointed up many of these test results to the district court. Indeed, it was only in the Secretary's reply brief to this Court that he argued that many of these tests supported his finding that Brown was not disabled.

6. We do not conclude here that Brown would not suffer from a disabling seizure disorder if he maintained therapeutic blood drug levels.

The issue before us is whether Brown has met the preliminary requirement of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.00 that he demonstrate compliance with prescribed anticonvulsive treatment.

7. The district court found that the ALJ failed to sufficiently examine Brown's nonexertional limitations before denying benefits. He concluded that the record did not contain sufficient evidence to conclude that Brown's seizure disorder would not interfere with employment. However, the medical and psychological reports in the record do address Brown's seizure disorder, and the ALJ properly concluded that because of this impairment, Brown could not engage in work involving machinery or heights. Thus, we can not agree with the district judge's

### V.

To summarize, we conclude that the Secretary's determination that Brown's impairment did not meet a "listed" impairment was supported by substantial evidence. We also conclude that the Secretary's determination that Brown retained the residual functional capacity to perform work existing in the national economy was supported by substantial evidence. We will therefore reverse the order of the district court, which had reversed the determination of the Secretary that Brown was not disabled.

conclusion that the Secretary did not consider Brown's nonexertional impairments, including his seizure disorder.