Walter WOODY, Appellant,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES.

No. 87–5818.

United States Court of Appeals, Third Circuit.

Argued May 6, 1988.

Decided Oct. 21, 1988.

Frank A. Cristaudo (argued), West Deptford, N.J., for appellant.

Samuel A. Alito, Jr., U.S. Atty., Cornelia E. Dude, Sp. Asst. U.S. Atty. (argued), Newark, N.J., for appellee.

Before HIGGINBOTHAM, STAPLETON and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge.

This appeal from a district court order affirming the denial of Social Security disability benefits comes to us after more than eight years of administrative and district court proceedings. We will reverse and direct that benefits be paid.

### I.

The claimant, Walter Woody, is a married 40–year old male with three children and has a full scale IQ of 77. Between his graduation from high school and 1979, when he last worked regularly, Woody was steadily employed for 14 years. During the last nine of these years, he worked as a maintenance mechanic for CBS Records. Woody claims that in April, 1979, he developed a disability that has prevented him from working.

Woody has testified that the symptoms of his disability include pain "all·over his body," especially in his legs, back, ribs, and right arm. He also claims to have difficulty walking, standing, or sitting for an extended period of time. In addition, he claims that he has difficulty bending, lifting, and climbing.

As of 1981, Woody had had 12 hospitalizations resulting from these symptoms and had been examined by numerous doctors. Other hospitalizations and examinations have followed, but no doctor has been able to diagnose definitively a physical cause of Woody's symptoms. The failure of Woody's doctors to find either a cause of or a cure for Woody's perceived physical problems has resulted in psychological difficulties for Woody. He is profoundly depressed and obsessed with his perceived illness and his inability to provide for himself and his family. He has testified that this depression has severely restricted his daily activities. Woody stays home in bed most of the time and does not drive. He has difficulty sleeping, shaving, bathing, and dressing himself. He feels isolated from his wife and children and does not participate in family social events or chores. Woody's testimony in this regard has been corroborated by the testimony of his wife and neighbors. A Social Security interviewer has noted that Woody "was completely *frustrated* because of his inability to get around and yet the doctors can't seem to find out what's wrong. He has a family to support and this upsets him also because the situation is getting desperate." 153a.

Woody underwent two psychiatric evaluations in 1981. Dr. N.J. George filed a report that diagnosed Woody as suffering from "reactive depression." Dr. George's report includes the following observations and conclusions:

> [Woody] stays home all the time. He is either on the bed or on the couch most of the time. He needs assistance to take a shower, dress etc. He is unable to shave, standing up. He does not go out of the house because of his difficulty in walking. He is unable to drive a car....
>
> \*　\*　\*　\*　\*　\*
>
> Patient is depressed because of severe pain and his inability to function normally. He has dif[f]use neurological signs. He is very much disgusted with himself and appears to have given up as he has not had any relief even after three years of hospitalizations and evaluations. It appears from the history his condition is progressing. I would consider him totally and permanently disabled because he

is even unable to take care of his basic needs like shaving, dressing, etc.

*Id.* at 416a–17a.

Dr. James Nelson also concluded that Woody was totally disabled. Dr. Nelson included anxiety and depression among Woody's presenting problems, and found Woody to be

obsessively pre-occupied with his multiple somatic complaints and he impressed me as somewhat tense and anxious and worried about his problems. In addition to this, I am sure that I was able to pick up significant hysterical features including unconscious tendencies to exaggerate his responses, exhibit his disability and over-react to stimuli.

*Id.* at 419a. Two doctors' reports from 1986 indicate that Woody continues to suffer from depression and anxiety.

Woody first filed an application for disability insurance benefits on November 14, 1979. After this application was denied initially and on reconsideration, Woody requested a review hearing, which was held on December 10, 1980. On January 26, 1981, the administrative law judge (ALJ) found that Woody was not entitled to disability benefits. Woody did not appeal, but he instead filed a second application. The second application was denied both initially and on reconsideration. Woody then requested a second hearing, which was held on June 29, 1982.

On September 17, 1982, a second ALJ held that Woody was not entitled to disability benefits. The ALJ found no objective medical findings corroborating Woody's subjective complaints and disbelieved Woody's own testimony regarding his pain. This decision was approved by the Appeals Council on January 5, 1983, and thereby became the final decision of the Secretary.

Woody then sought judicial review. The district court vacated the Secretary's decision and remanded for further administrative proceedings. Of relevance here is the district court's determination that the ALJ's conclusion that Woody's return to work would significantly alleviate his depression constituted an unauthorized medical opinion contrary to that of Dr. George.

Thereafter, a third hearing was held on March 13, 1985 and on June 26, 1985 the ALJ again denied Woody's claim. The ALJ found "no convincing evidence of a mental impairment which alone or in conjunction with other impairments, would impose significant limitations of function." 258a. The Appeals Council remanded to the ALJ, however, to reconsider the claim in light of the new regulations concerning mental impairments published on August 28, 1985 pursuant to the Social Security Disability Benefits Reform Act of 1984, Pub.L. No. 98–460, § 5, 98 Stat. 1794 (1984). The Appeals Council also directed the ALJ to complete a Psychiatric Review Technique Form along with its recommended decision.

On May 13, 1986 a fourth administrative hearing was held. An updated report from Dr. George was submitted reflecting that Woody continued to report constant pain and remained in a state of depression. Dr. George noted "suicidal ideation" and "poor" sleeping, as well as the following lifestyle:

Patient stated that he stays in bed all the time because of the pain. Listens to his radio and very seldom goes out shopping or outside. He does hardly any driving because he is afraid to drive because of the weakness of his legs.

His hobbies are fishing but has not done this for the past 4 years. He does not do any cooking or cleaning. He has no social activity. Does not even visit family members. Has difficulty getting into the tub. He takes sponge baths and needs help from his wife to wash below the knees. He is unable to put on his socks or tie shoes.... Has lost interest in sex; feels hopeless and helpless.

683a. On July 16, 1986 the ALJ once again denied Woody's claim.

The Appeals Council adopted the ALJ's recommended decision and Woody again sought judicial review. This time the district court affirmed the Secretary's decision on the ground that substantial evidence supported the ALJ's application of the new regulations concerning mental impairments. This appeal followed. We have jurisdiction under 28 U.S.C. § 1291 (1982).

## II.

The standard of review in this case is whether there is substantial evidence in the record to support the Secretary's decision. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir.1988). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). It is more than a mere scintilla of evidence but may be less than a preponderance. *Brown*, 845 F.2d at 1213.

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (1982). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). A physical or mental impairment constitutes a disability under the Act only if it is "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A) (Supp. IV 1986). In demonstrating his disability, the claimant may not rely solely on his own stated symptoms, but must provide

> medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which ... would lead to a conclusion that the individual is under a disability.

*Id.* § 423(d)(5)(A) (Supp. IV 1986).

A claimant may show that he is disabled in one of two ways. First, he can introduce evidence that his symptoms, signs, and laboratory findings match or surpass those of one or more of the serious impairments contained in the "Listing of Impairments," 20 C.F.R. Pt. 404, Subpt. P, App. 1 (1987), and that he is therefore disabled *per se*. 20 C.F.R. § 404.1520(d) (1987); *Brown*, 845 F.2d at 1213. Second, he can introduce evidence that even if he does not suffer from a "listed" impairment, his "residual functional capacity" resulting from his impairment prevents him from engaging in his past work or any other work. 20 C.F.R. § 404.1520(e), (f) (1987); *Brown*, 845 F.2d at 1213-14. Once the claimant has introduced a *prima facie* case that he is unable to return to his prior employment, the burden shifts to the Secretary to demonstrate that the claimant has sufficient "residual function capacity" to perform a job available in the national economy. *Rossi v. Califano*, 602 F.2d 55 (3d Cir.1979).

The Secretary has also promulgated regulations dealing specifically with the evaluation of mental impairments. *See* 20 C.F.R. § 404.1520a (1987). The same general procedure described in section 404.1520 applies, but in addition the agency must complete a "standard document," *see id.* § 404.1520a(d), called a "Psychiatric Review Technique Form," which is essentially a checklist that tracks the requirements of the Listings of Mental Disorders. *Id.* Pt. 404, Subpt. P, App. 1, § 12 (1987). The regulations permit an ALJ to complete the form without the assistance of a medical adviser. *Id.* § 404.1520a(d)(1)(i). However, there must be competent evidence in the record to support the conclusions recorded on the form and the ALJ must discuss in his opinion the evidence that he considered in reaching the conclusions expressed on the form. *See id.* § 404.1520a(c)(4).

## III.

Despite the fact that the last administrative hearing was held for the sole purpose of reconsidering the mental impairment issue in light of the new regulations, the ALJ's report, which was adopted by the

Secretary, provides very little insight into his analysis of that issue.

The ALJ begins by noting "that Mr. Woody had undergone multiple tests without any clear diagnosis or clear explanation for his complaints" and that there had been "a paucity of neurological findings." 307a. He then acknowledges the existence of the report from Dr. Nelson and the two reports from Dr. George. The ALJ discounts the former solely on the ground that it "reported that the claimant was '... obsessively preoccupied with his multiple somatic complaints ...' and presented an individual who displayed '... significant hysterical features including unconscious tendencies to exaggerate his responses, exhibit his disabilities and over-react to stimuli ...'" 308a. The ALJ also discounts Dr. George's diagnostic opinion, but on the ground that Dr. George "relates Mr. Woody's depression to physical pain which is not corroborated by the extensive medical evidence now of record." 308a–309a. With respect to the second George report, the ALJ added that it reflected an examination conducted in March 1986, "well after the date when the claimant last met the disability insured status requirements,[1] despite the fact that that report reflected a continuation of the same condition reported in the 1981 report." Without further analysis of the mental impairment issue, the ALJ concludes his discussion of the evidence with the following:

> We have given careful consideration to Mr. Woody's allegations and statements concerning his pain and discomfort. Nevertheless, having had the opportunity to observe Mr. Woody on two separate occasions, we are not convinced by his allegations of "disabling" pain. In evaluating pain, various indicia of pain should be considered, e.g. clinical findings by physicians on physical examination, observations by physicians regarding limitations of motion due to pain, expres-

sions of pain during the hearing, the need for medication, and the nature and extent of the claimant's daily activities. Our review of the record and the testimony does not convince us that Mr. Woody suffers from such pain/discomfort as to render him "disabled."

The preponderance of the documentary evidence shows that Mr. Woody retains the residual functional capacity for his past customary work as a maintenance mechanic at CBS Records. We find that the evidence now of record does not establish a physical or mental impairment, or a combination of impairments, which would prevent the claimant from engaging in such past customary work at any time beginning on or before December 31, 1983, i.e. the date he last met the disability insured status requirements of the Act....

309a–310a.

A Psychiatric Review Technique Form is appended to the ALJ report, but is not referred to therein. Despite the ALJ's rejection of the diagnostic opinions of Drs. George and Nelson, he answered the segment of the form entitled "Affective Disorders," by finding that Woody suffered from "Disturbance of mood, accompanied by a full or partial ... depressive syndrome, ... characterized by ... Anhedonia or pervasive loss of interest in almost all activity ... [and] [t]houghts of suicide." 315a; 20 CFR Part 404, Subpt. P, App. 1, § 12.04 A Mental Disorders. The ALJ did not, however, find that Woody's depression syndrome was also characterized by "Sleep disturbance" or "Feeling of guilt or worthlessness." Under the regulations, the consequence of an affirmative finding on these two points would have been a conclusion that Woody suffered from a "medically substantiate[d] ... mental disorder," namely an "Affective Disorder." *Id.*

In responding to the section of the form (i.e. "B" Criteria of the Listing) used to

---

1. The Secretary concluded that Woody's "date last insured" was December 31, 1983. Woody argued before us, however, that because he worked sporadically in 1979 and 1980, his date last insured may in fact have been 1984 or 1985. We will not resolve this argument because it was not raised before the Secretary or the dis-

trict court. In any case, the time limit for correcting Woody's earnings records appears to have run. *See* 20 C.F.R. § 404.802 (1987). As a result, the Secretary's records are conclusive evidence of Woody's wages, *see id.* § 404.803, since none of the exceptions applies in this case. *See id.* § 404.822.

determine whether a mental disorder is sufficiently severe to warrant a finding of disability without an analysis of retained functional capacity, the ALJ found that Woody's state of depression had resulted in "Moderate," but not "Marked," "Restriction of Activities of Daily Living" and in "Moderate," but not "Marked," "Difficulties in Maintaining Social Functioning." In each instance, the ALJ declined the invitation of the form to find "Insufficient Evidence." Assuming that the ALJ had found the presence of an "Affective Disorder," the consequence of finding "marked," rather than only "moderate," impairments of daily living activity and social functioning would have been a conclusion that Woody was disabled.[2]

## IV.

■ To the extent the Secretary rejected or discounted the reports of the only two psychiatrists to examine Woody, we find his explanation wholly unsatisfying. He apparently interpreted Dr. Nelson's observations of "histeria," "obsessive preoccupation" and "unconscious tendencies to ... exhibit his disability and over-react to stimuli" as some sort of confirmation of the suggestion that Woody's complaints were feigned. We fail to follow this logic.

■ Nor do we follow the logic of the analysis that Dr. Nelson's opinion regarding "depression" must be discounted because the complaints of pain cannot be medically verified. The Secretary's regulations acknowledge that a mental disorder may be medically verified even though associated complaints of pain have not been verified.[3] Nothing in the Act or regulations requires that mental disability be a result or a cause of objectively verifiable pain. The Act requires only that the claimant demonstrate by medically acceptable evidence that a mental impairment *exists* and is producing disabling "pain or *other symptoms*." 42 U.S.C. § 423(d)(5)(A) (Supp. IV 1986). This is a case in which Woody's mental impairment and its disabling impact on his ability to function has been medically substantiated by two qualified, treating psychiatrists and the Secretary was not free to substitute his own opinion based solely upon the fact that Woody's complaints of pain could not be medically verified.

■ Turning to the findings on the Psychiatric Review Technique Form, we find no rational basis in the record for the Secretary's acceptance of the record evidence that Woody had a "Disturbance of mood" accompanied by a "depressive syndrome" involving "pervasive loss of interest in almost all activities" and "thoughts of suicide" and his rejection of the record evidence that the depressive syndrome involved "sleep disturbance" and "feelings of worthlessness." There is simply no difference in the probative value of the evidence supporting the findings made and of that supporting the findings the Secretary declined to make. Furthermore, in both instances there was no evidence contradicting the proposed findings.[4]

We have similar difficulty with the Secretary's finding that Woody's mental impairment occasioned only moderate restriction

**2.** Woody in his brief and the district court in its opinion discussed only the listing for "Somatoform disorders" in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07 (1987), even though the ALJ found evidence only of an impairment under § 12.04. One significant difference between § 12.07 and § 12.04 is that under § 12.04 the claimant needs to meet only two of the "B" criteria rather than three. Thus, the district court's conclusion in its opinion that Woody does not qualify as disabled under § 12.07, since he does not meet two out of four "B" criteria, does not preclude the possibility that Woody qualifies under § 12.04. Because we conclude that Woody qualifies as disabled under § 12.04, we need not reach the issue of whether he also qualifies under § 12.07.

**3.** Section 12.07, for example, defines "Somotoform" Mental Disorders. These disorders involve "Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms."

**4.** Dr. George notes both that Woody's sleep has been disturbed and that he "is very much disgusted with himself." 416a. Dr. Benn also reported in February of 1982 that Woody's "extreme anxiety and depress[ed] state" were causing sleeping problems. 420a. There was no contrary evidence or findings.

of his daily living activities and only moderate difficulty in maintaining social functioning. The *only* evidence on these matters was that Woody could not perform even the simplest daily chores involved in caring for himself, spent virtually all his time at home in bed, and was isolated not only from the outside world but also from the members of his family. There was no contrary evidence and the ALJ made no contrary findings.[5]

As we have earlier noted, if the ALJ had made logically consistent findings on the form, he would have been forced to conclude that Woody was disabled without reaching an analysis of Woody's retained functional capacity. Even if that were not the case, however, the Secretary's decision could not be sustained. If the Form does not dictate a conclusion of disability, the Secretary's regulations call for a determination of whether the alleged mental disorder has left the claimant with sufficient residual functional capacity to perform his or her former work or other work in the economy. Here, despite the explicit charge of the Appeals Board, the ALJ made no analysis of what, if any, vocational limitations Woody's mental impairment imposed.

All that the record contains is the ALJ's conclusory statement that there is no "mental impairment ... which would prevent claimant from engaging in [his] past customary work" and the unexplained findings on the form that the impairment had "moderate" rather than "marked" consequences on Woody's ability to perform daily activities and function in society. This conclusory language does not permit meaningful review of the Secretary's decision.

## V.

█ If the only problem in this case were the ALJ's failure to meaningfully address the issue concerning the vocational impact of Woody's mental state, we would, of course, remand for further proceedings. As we have indicated, however, the matter is not that simple. Eight years of administrative and judicial proceedings have produced a record in which the *uncontradicted* medical and lay evidence demonstrates that Woody suffers from a mental impairment and that that impairment has had a devastating impact on his ability to function in society. It was this evidence that occasioned the remand to the ALJ for further investigation of the case. The Secre-

---

5. The regulations offer the following explanation of "activities of daily living":

> 1. *Activities of daily living* include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for one's grooming and hygiene.... It is necessary to define the extent to which the individual is capable of initiating and participating in activities independent of supervision or direction.
>
> "Marked" is not the number of activities which are restricted but the overall degree of restriction or combination of restrictions which must be judged. For example, a person who is able to cook and clean might still have marked restrictions of daily activities if the person were too fearful to leave the immediate environment of home and neighborhood, hampering the person's ability to obtain treatment or to travel away from the immediate living environment.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1) (1987). Under this definition, substantial evidence exists in the record that Woody has experienced marked, rather than moderate, limitation of his daily activities. Dr. George noted in his report that Woody is unable to shave and needs assistance to take a shower and to dress. App. at 416a; 417a. Woody also testified to the same effect. In addition, Woody testified that he does not cook, carry groceries, or help with the housework and that he stays home in bed most of the time.

> The second "B" criterion, "social functioning," refers to an individual's capacity to interact appropriately and communicate effectively with other individuals. Social functioning includes the ability to get along with ... family members, friends, neighbors.... Impaired social functioning may be demonstrated by a history of ... avoidance of interpersonal relationships, social isolation, etc. ...
>
> "Marked" is not the number of areas in which social functioning is impaired, but the overall degree of interference in a particular area or combination of areas of functioning.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2) (1987). The record evidence indicates that Woody has become socially isolated. Woody testified that "I just want to be by myself." 298a. He also testified that he does not spend time with his children, and feels "[l]ike now I'm not even a father." *Id.* He further testified that he does not visit his brothers and sisters. Woody's wife testified that Woody does not go out with her or the rest of the family, and that they do not have sexual relations. This testimony is corroborated by the report of his treating doctors.

tary could have sought consultation with a third psychiatrist and/or further investigation of the day-to-day effects of the mental impairment. The ALJ, however, developed nothing to rebut Woody's well-developed *prima facie* case and avoided a decision in Woody's favor only by effectively bypassing the issue concerning the effects of the mental impairment. Under these circumstances, we conclude that this is an appropriate case for the exercise of our prerogative to direct an award of benefits. *See e.g., Podedworny v. Harris,* 745 F.2d 210, 221–22 (3d Cir.1984) (direction that benefit be paid was appropriate "when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits"); *Rossi v. Califano,* 602 F.2d 55 (3d Cir.1979) (when claimant establishes *prima facie* case, no substantial contrary evidence, and no evidence of a possibility of alternative employment, a remand is unnecessary).

The judgment of the district court will be reversed and the case remanded with instructions to the district court to enter an order directing the payment of benefits.