**Dorothy MELTON, on behalf of Charles MELTON, deceased**

**v.**

**SECRETARY OF HEALTH AND HUMAN SERVICES.**

**Civ. A. No. 85–4376.**

United States District Court,
E.D. Pennsylvania.

May 14, 1990.

---

S. Robert Levant, Philadelphia, Pa., for plaintiff.

Virginia Gibson–Mason, Asst. U.S. Atty., Beverly Dennis, III, Chief Counsel, Region III, Dept. Health & Human Services, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

The plaintiff in this social security disability case is the widow of Charles Melton, a former truck driver who was injured in a tractor-trailer accident that occurred on May 23, 1980. At the time of the accident, Mr. Melton was fifty-five years old. He ceased working the day he was injured and filed for disability insurance benefits in February of 1981, alleging that he suffered from neck, lower back, leg, and wrist injuries caused by the accident, as well as psychological problems, all of which rendered him physically and emotionally unable to continue working in any capacity. Mr. Melton's application was denied one month later. On January 29, 1984, Mr. Melton died following a heart attack. There is no evidence that the heart attack was related to the accident. Plaintiff submitted a claim for disability insurance benefits on behalf of her husband in February of 1984, which was denied initially and upon reconsideration. After a hearing and a *de novo* review of the record, an administrative law judge concluded that "[t]he deceased wage earner was 'not disabled' at any time through the date of his death." Tr. at 66. After the Appeals Council refused to disturb the ALJ's ruling, plaintiff appealed the decision to this court, which remanded the matter back to the Secretary of the Department of Health and Human Services for further administrative action pursuant to Section 5 of the Social Security Disability Benefits Reform Act of 1984, which governs the determination of disability due to mental disorders. The Appeals Council then remanded the case to the ALJ.

On September 26, 1986, the ALJ issued his findings. He concluded that "[t]he deceased wage earner's established impairments were chronic cervical and lumbosacral strain and acute anxiety with a depressive reaction" which "limited his maximum sustained work capacity to work at a light exertional level." Tr. at 31. Nonetheless, the ALJ found that the deceased "was 'not disabled' at any time through the date of his death," because he "had acquired skills that could be transferred to light work activity," and his "nonexertional anxiety and depressive reaction did not significantly affect his ability to engage in those jobs testified to by a vocational expert." *Id.* Because the only issue on remand had concerned whether Mr. Melton should have been adjudicated disabled due to a mental disorder, the ALJ did not reconsider the other issues raised in the application for benefits and instead "concur[red] with the previous determination that from an exertional standpoint, ... a finding of not disabled was warranted." Tr. at 30. On appeal, the Appeals Council affirmed the ALJ's decision. The plaintiff then filed a motion for summary judgment in this court to which the Secretary responded with a cross-motion for summary judgment. The United States magistrate filed a report recommending that the plaintiff's motion be denied and that the Secretary's motion be granted. For the reasons that follow, I decline to adopt the magistrate's recommendation and will instead enter summary judgment in favor of the plaintiff and against the Secretary.

Eligibility for social security benefits is based on a two-pronged test: (1) determination of the extent of disability; and (2) determination whether that impairment results in inability to engage in substantial

gainful activity. *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir.1979). A claimant satisfies her initial burden of proof by showing that the wage earner was unable to return to his customary occupation. *Id.* Once she has made such a showing, the burden of proof shifts to the Secretary to show that the wage earner, given his age, education, and work experience, has sufficient "residual function capacity" to perform specific jobs that exist in the national economy. *Id.; Woody v. Secretary of Health and Human Services*, 859 F.2d 1156, 1159 (3d Cir.1988). If there is no finding regarding the availability of alternative employment, a denial of benefits can only be sustained if there is medical evidence in the record that the wage earner's impairment did not prevent him from engaging in his former occupation. *Rossi*, 602 F.2d at 57.[1]

Mrs. Melton satisfied her initial burden of showing that her husband was physically incapable of returning to his previous employment with the uncontroverted testimony of each of the physicians who examined Mr. Melton between the date of his accident in 1980 and his death in 1984. In July of 1980, Mr. Melton visited Dr. David Cooper at North Penn Hospital complaining of severe lower back pain and radiation of the pain into his right arm and left leg. Dr. Cooper suspected that he was suffering from a herniated disk. Mr. Melton was hospitalized for one week for testing, at which time a colleague of Dr. Cooper's, Dr. Skubick, concluded that he had a lumbo-sacral strain with no neurological deficit. Tr. at 174–75.

Mr. Melton continued to experience extreme pain and resulting loss of movement in his back, arm, and leg, which prevented him from returning to work as a truck driver.[2] In March of 1981, the wage earner was examined by Dr. Victor Vare, an orthopedist, who diagnosed him as having Grade I spondylolisthesis, a spine condition which is often congenital and which, in Mr. Melton's case, caused an anterior displacement of the vertebrae. Tr. 190–91. Dr. John Williams, an orthopedic surgeon, examined Mr. Melton for the first time on August 27, 1981. After a series of x-rays, an electromyogram, and a follow-up examination on September 22, 1981, Dr. Williams described Mr. Melton's condition as "an acute cervical spondylolisthesis," with "the possibility of continuous progressive degenerative disease in both the cervical and lumbar areas." Tr. at 198. Dr. Williams concluded "that with this pathology, ... [Mr. Melton] should not be permitted to return to work as a Truck Driver." *Id.* Dr. Williams recommended that any future employment of Mr. Melton would have to be "a light duty or sedentary type of position." *Id.*

After a complete lower back study the following year, including the lumbosacral spine and pelvis, Dr. Irving Wexlar found in June of 1982 that Mr. Melton was experiencing "disc pathology" at the site of the spondylolisthesis, a spina bifida deformity at the first sacral segment of the spine, and a bone defect in the right ilium. After examining the wage earner and reviewing all of his medical records to date, Dr. Leon-

---

1. A Social Security claimant can also establish disability by introducing evidence that the wage earner's symptoms, signs, and laboratory findings match or surpass those of one or more of the serious impairments contained in the "Listing of Impairments," 20 C.F.R. Pt. 404, Subpt. P, App. 1 (1987), and that the wage earner is therefore disabled *per se.* 20 C.F.R. § 404.1520(d) (1987). The ALJ who evaluated Mrs. Melton's claim in 1985 and the ALJ who heard the case on remand both concluded that Mr. Melton did not suffer from an impairment that met or equaled in severity that of any impairment described in the "Listing of Impairments." Tr. at 31, 65. The plaintiff has not challenged this finding.

2. It appears from Mr. Melton's medical records that he experienced a persistent phobia of driving trucks following his accident which may also have prevented him, at least temporarily, from returning to his former occupation. *See* Tr. 184–85, 188, 198. However, because Mr. Melton's work as a truck driver also required that he lift, load, and carry the goods which he transported, placing his job in the "medium to heavy classification" from an "exertional perspective," Tr. at 109, there is no dispute that Mr. Melton remained physically incapable of resuming his former occupation from the date of his accident until the date of his death. *See* Tr. at 31, 65 (ALJ's finding that "[t]he wage earner's established impairments limited his maximum existing work capacity to work at a light exertional work level.")

ard Klinghoffer wrote in June of 1982 that Mr. Melton's "underlying bone instability [i.e., his spondylolisthesis] is prolonging those symptoms that were brought on by his [tractor-trailer] injury." Tr. at 202. Dr. Klinghoffer concluded that Mr. Melton "is disabled from performing any type of significantly physical work. He cannot be expected to perform any job that requires lots of bending or lifting or prolonged periods of weight bearing." *Id.*

Mr. Melton's spinal condition had not improved by December of 1982. Upon re-examination, Dr. Klinghoffer noted that although Mr. Melton told him that physical therapy offered temporary relief of his symptoms, in the doctor's opinion, "the overall situation ... has not changed significantly." Tr. at 203. There was no evidence in the record that Mr. Melton's physical condition had improved between December of 1982 and the date of his death in January of 1984.

Mr. Melton also experienced an acute anxiety reaction to the tractor-trailer accident which resulted in depression, forgetfulness, an inability to concentrate, and a severe phobia associated with truck driving. Dr. Cooper referred Mr. Melton to a psychiatrist, Dr. William Boehmler, whom Mr. Melton visited periodically between July 19, 1980, and June 30, 1981. Dr. Boehmler prescribed an anti-depressant medication, and in a letter to Mr. Melton's attorney in November of 1980, he stated that as a result of the combination of psychotherapy and medication, Mr. Melton "has gradually been able to resume his normal life activities around the home." Tr. at 185. Dr. Boehmler concluded in March of 1981 that because of Mr. Melton's phobia, "although he has improved, at this time it does not seem possible for him to resume his driving occupation." Tr. at 188. While Dr. Boehmler stated that he expected that Mr. Melton "could participate in

more sedentary work," *id.,* he acknowledged that he was "not aware of [Mr. Melton's] current limitation with regard to his back pain and sprain; [therefore,] there may be reason in that area that he cannot resume work activity," *id.* at 189.

Plaintiff does not challenge the ALJ's finding that Mr. Melton's psychological disorder was not disabling,[3] nor does she oppose the ALJ's finding that her husband's back ailment did not render him disabled *per se.* She objects to the ALJ's conclusion—and the magistrate's recommendation that I affirm that conclusion—that Mr. Melton had transferable skills which could have been applied to alternative employment in the trucking industry.

My function upon review is to determine if the Secretary's decision is supported by substantial evidence, and if so, to affirm that decision. 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Because the last administrative hearing was held for the sole purpose of reconsidering the mental impairment issue in light of Section 5 of the Social Security Disabling Reform Act, it is appropriate to review the basis for the original ALJ's decision that despite Mr. Melton's physical limitations, he retained sufficient "residual function capacity" to perform a job available in the national economy.

■ The ALJ summarily discounted the opinions and conclusions of plaintiff's vocational expert, Dr. Philip Spergel, a licensed rehabilitation psychologist, who had administered extensive vocational, academic achievement, and visual and manual coordination tests to Mr. Melton in June of 1983. The ALJ determined that the introductory portion of Dr. Spergel's report, in which he recounted Mr. Melton's history and symptoms, was "incorrect and inconsistent with

3. A psychological disorder is not necessarily disabling; there must be a showing of related functional loss. For example, severe anxiety or depression is not in itself sufficient to establish eligibility for benefits, absent proof that the impairments render the wage earner unable to engage in gainful employment. *See Sitar v.*

*Schweiker,* 671 F.2d 19, 20 (1st Cir.1982). The ALJ properly credited Dr. Boehmler's reports that Mr. Melton had made considerable progress from psychotherapy and with medication to control his depression, thereby precluding a finding that Mr. Melton was disabled due to a psychological impairment.

actual medical records in evidence." Tr. at 63. The ALJ fails to identify these alleged inconsistencies, and, upon review of Dr. Spergel's report, I am unable to locate any material discrepancies. In any event, Dr. Spergel was not consulted to evaluate Mr. Melton's orthopedic condition; he is not an orthopedic specialist. Hence, Dr. Spergel's introductory remarks provided helpful background information about the patient that were at best tangential to his thorough analysis of Mr. Melton's test results.[4] The ALJ was incorrect to disregard Dr. Spergel's psychological evaluation on the basis of information not material to that evaluation.

■ Dr. Spergel administered the following tests to Mr. Melton: Wechsler Adult Intelligence Scale; Hackman–Garther Vocational Interest Inventory; Gates Reading Survey; Arithmetic subtest of Wide Range Achievement; Employee Aptitude Survey; Bennett Mechanical Comprehension Test; Hooper Visual Organization Test; Handicap Problems Inventory; Rotter Incomplete Sentences Blank; and Bender Gestalt Test. Based on the results of these tests, Dr. Spergel reported that Mr. Melton's full scale I.Q. was 103. Although his reading speed and accuracy were at a twelfth grade level, his reading comprehension placed him between the third and fourth grades, indicating that he neither understood nor retained large portions of what he read. His arithmetic grade level was mid-fourth grade, and he was "only able to compute the routine operations of addition and subtraction as well as simple multiplication and addition." Tr. at 208. Dr. Spergel found that Mr. Melton's visual speed and accuracy and space visualization placed him in the second percentile of the "general productive male population." Id. His manual speed and accuracy placed him in the thirtieth percentile, and his mechanical comprehension was average, in the fiftieth percentile. Dr. Spergel determined that Mr. Melton's concentration was impaired and that he therefore had "[d]ifficulty in maintaining an appropriate mental set for significant periods of time." He was "slow

to master new rote material," "is not able to use insight in problem solving situations," and "learns principally via trial and error." Id. Although tests indicated that Mr. Melton was disorganized, his "conceptualization ability appeared relatively good," and he had "the potential to anticipate future events from present circumstances." Id. Mr. Melton's "visual motor coordination [wa]s poor," however. He could not "deftly integrate eye-hand movements," and "he demonstrate[d] moderate visual organization impairment." Id.

After analyzing Mr. Melton's test results, Dr. Spergel's professional opinion was that it was "highly unlikely that [Mr. Melton] could return to his former position or, for that matter, function at any job competitively for a sustained period of time." Tr. at 210. He concluded that "[f]or all intent and purpose, [Mr. Melton] had[d] no transferable skills." Id. In addition, Dr. Spergel opined that because of Mr. Melton's advancing age (he was fifty-eight at the time of the evaluation), "placement would be extremely difficult even were he employable." Id.

Unlike Dr. Spergel, the government's vocational expert, Dr. Bernard Albert, did not have the opportunity personally to examine or to test Mr. Melton before his death, but instead reviewed the decedent's medical records and Dr. Spergel's test results and evaluation. Dr. Albert testified at plaintiff's initial administrative hearing in January of 1985 by responding to questions posed by the ALJ. The following exchange ensued between Dr. Albert and the ALJ:

Q. So dispatching would be about the only type of work activity outside of driving to which [Mr. Melton's] knowledge and skills would be transferred?

A. Yes and ... the dispatching aspects may call for skills other than what he possessed. Language skills and numerical skills. That sort of thing.

Q. According to reports of Mr. Melton we have, Mr. Melton indicated he was a high school graduate.

4. Dr. Spergel's complete report is contained in the administrative record at pp. 204–210.

A.   Yes but there was other data in the record which I reviewed that there was some—

Q.   Base your answer on my hypothetical.

A.   I am sorry. *Assuming that he was a high school graduate,* then I would have to assume some basic language skills that he could do within the industry perhaps in recording and checking items by date or time. Delivery dates. Weights of cargo that may be carried. Record keeping jobs within the trucking industry.

Tr. at 110–11 (emphasis added).

Dr. Albert then testified that jobs involving record keeping and inventory control exist in the upper hundreds in the trucking industry. Tr. at 111–12. The ALJ did not question him concerning Mr. Melton's ability to engage in gainful employment outside of the trucking industry; hence, the only evidence of record is Dr. Spergel's report, which states conclusively that Mr. Melton could not function competitively in any job. Tr. at 210.

On cross-examination, Dr. Albert testified that as a vocational expert, one of the tools he would use in evaluating a claimant would be knowledge of the skills that claimant actually possessed, regardless of educational background. Tr. at 112. Upon further questioning by plaintiff's attorney, Dr. Albert testified that, were he to assume that Dr. Spergel's findings regarding Mr. Melton's functional skills were accurate, he would agree with Dr. Spergel's conclusions as to Mr. Melton's functional capacity at the time of testing. Tr. at 112–13. Because the ALJ disregarded Dr. Spergel's test results, he also discounted the testimony of Dr. Albert that was based

on Dr. Spergel's assumptions. *See* Tr. at 64.

The record reflects the fact that the ALJ based his finding that Mr. Melton possessed transferable skills on his assumption that Mr. Melton was a high school graduate. *See* Tr. at 60–61, 64. Indeed, there was conflicting evidence concerning the number of school years completed by Mr. Melton. In Mr. Melton's original application for Social Security benefits, he wrote that he had completed the twelfth grade. Tr. at 122. Plaintiff's application, however, filed after her husband's death, listed eighth grade as the highest level completed in school. Plaintiff's testimony corroborated her application. Tr. at 144. According to Dr. Spergel's report, Mr. Melton told the doctor that he had attended school until the seventh grade, "but could not recall if he had completed the year." Tr. at 206. In Dr. Williams' report, he quotes Mr. Melton as saying without provocation, "I have a high school education." Tr. at 197. Of course, it is the ALJ and not the court who is charged with the duty to weigh conflicting evidence and to draw an appropriate conclusion. *See Powers v. Heckler,* 738 F.2d 1151 (11th Cir.1984); *Cotter v. Harris,* 642 F.2d 700, 705, *reh'g denied,* 650 F.2d 481 (3d Cir.1981). Even though Mr. Melton wrote that he had completed the twelfth grade, there is nothing to suggest that he ever received a high school diploma; nonetheless, despite my reservations, I will not disturb the ALJ's apparently pivotal finding that Mr. Melton was a high school graduate. What I cannot sustain is the conclusion reached by the ALJ and affirmed by the Appeals Council,[5] *solely* on the basis of that finding, that Mr. Melton possessed the skills required to qualify for light work in the trucking industry, such as dispatcher and inventory controller. *See* Tr. at 64.[6]

---

5.   The Appeals Council states in its decision dated March 13, 1987:

> In this regard, the Appeals Council notes that a vocational expert testifying at the hearing on January 4, 1985 indicated that the claimant's work as a tractor-trailer driver was semi-skilled, with skills transferable to light work in the trucking industry such as record keeping, time record keeping and logging of mileage.

Tr. at 5.

6.   Consequently, I cannot adopt the magistrate's report and recommendation which "agrees with the ALJ's conclusion that there is substantial evidence to support a finding that Mr. Melton did complete high school, which would indicate that Mr. Melton did have transferable skills which could have been applied in other types of employment in the trucking industry." Report and Recommendation at 10–11.

In light of Dr. Spergel's recent and comprehensive test results, which placed Mr. Melton at the third and fourth grade levels for reading comprehension and basic arithmetic in 1983, the fact that he may have been graduated from high school in 1943 is irrelevant. The ALJ spends a good deal of time explaining why he credits the evidence that Mr. Melton completed high school over the evidence that he did not. Tr. at 60–61. I fail to comprehend the ALJ's preoccupation with the existence of a forty-two year old high school diploma when the evidence overwhelmingly suggests that the wage earner no longer possessed the skills which may have earned him that now meaningless piece of paper. No doubt, Mr. Melton may at one time have had the reading and math skills of the average twelfth grader. Perhaps, however, he graduated from high school without the requisite basic skills, a not uncommon phenomenon according to national illiteracy studies. Regardless of Mr. Melton's scholastic abilities in 1943, to hold him to those same standards today in evaluating whether he has transferable skills would be as illogical as relying on his high school medical records to determine whether he is currently physically able to resume truck driving.

The general rule is that in order for a vocational expert's response to a hypothetical question to be relevant, the "input" into that hypothetical must correspond to conclusions that are supported by the "output" from medical authorities. *Arocho v. Secretary of Health and Human Services*, 670 F.2d 374, 375 (1st Cir.1982). The "input" into the hypothetical posed by the ALJ to Dr. Albert did not correspond to conclusions supported by any of the medical authorities on record; therefore, Dr. Albert's response must be discounted. Because the ALJ referred to no other bases in the record to substantiate his conclusion that Mr. Melton was capable of performing other jobs in the trucking industry, his conclusion is not supported by substantial evidence and cannot be sustained. *See Doak v. Heckler*, 790 F.2d 26, 30 (3d Cir.1986).[7]

In this case, remand to the Secretary for additional findings regarding transferable skills is inappropriate. Because Mr. Melton is deceased and almost six years have passed since plaintiff submitted her claim, additional fact-finding would likely reveal nothing and would unduly prejudice the claimant. The administrative record is complete. The evidence can support no more than a finding that between the date of his accident and the date of his death, Mr. Melton was physically unable to resume his previous occupation, could engage in only light duty work, and had no transferable skills. 42 U.S.C. § 423(d)(2)(A) (Supp. IV 1986). Under these circumstances, an award of benefits is compelled. *See Woody v. Secretary of Health and Human Services*, 859 F.2d 1156, 1163 (3d Cir. 1988); *Podedworny v. Harris*, 745 F.2d 210, 221–22 (3d Cir.1984); *Rossi v. Califano*, 602 F.2d 55 (3d Cir.1979) (when claimant establishes *prima facie* case, no substantial contrary evidence, and no evidence of a possibility of alternative employment, remand to determine eligibility for benefits is unnecessary). I will therefore grant plaintiff's motion for summary judgment and remand this case to the Secretary of

---

7. Both the ALJ and the Appeals Council rely on the report of Dr. Boehmler, plaintiff's psychiatrist, to support their respective conclusions that Mr. Melton was not disabled. *See* Tr. at 62, 66. Both the ALJ and the Appeals Council appear to confuse the relevance of Dr. Boehmler's reports with that of the vocational experts and that of the orthopedic specialists who examined Mr. Melton. Although Dr. Boehmler did state that he did not feel that Mr. Melton should enter a "disability program," it is not clear what he had in mind when he used that term. In any event, Dr. Boehmler's recommendation was made entirely from a psychological standpoint. *See* Tr. at 189, 192. In his last two evaluations of Mr. Melton, Dr. Boehmler stated that he was un-

aware of the current limitations posed on his patient by his back injury. Tr. at 189, 193. It is apparent that Dr. Boehmler's expertise was limited to determining whether his patient's mental state rendered him disabled (which he properly concluded it did not), and to evaluating his patient's readiness *psychologically* to resume work. Dr. Boehmler was never retained as a vocational expert, and at no time did he conduct an evaluation of the specific types of work Mr. Melton was capable of doing. It was therefore inappropriate for the ALJ and the Appeals Council to rely on Dr. Boehmler's reports as evidence that Mr. Melton possessed transferable skills.

874

Health and Human Services for the sole purpose of calculating and awarding benefits to plaintiff. An order follows.

## ORDER

AND NOW, this 14th day of May, 1990, for the reasons stated in the accompanying memorandum, it is hereby ordered:

1. Plaintiff's motion for summary judgment is granted;

2. Defendant's motion for summary judgment is denied; and

3. This case is remanded to the Secretary of Health and Human Services for an entry of an award of disability benefits to plaintiff, retroactive to the date of her application.