**Ramon JACKMAN, Plaintiff,**

v.

**Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant.**

**Civ. A. No. 89–1175.**

United States District Court, W.D. Pennsylvania.

Jan. 16, 1990.

Robert Peirce & Associates, Pittsburgh, Pa., for plaintiff.

Robert L. Eberhardt, Asst. U.S. Atty., Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

COHILL, Chief Judge.

Plaintiff Ramon Jackman has brought this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. 405(g). He seeks review of the final decision of the defendant Secretary of Health and Human Services denying his claim for disability insurance benefits. Presently before the Court are the parties' cross motions for summary judgment. For the reasons stated below, we will grant plaintiff's motion and deny defendant's motion.

### I. PROCEDURAL HISTORY

Mr. Jackman filed a claim for disability insurance benefits and Supplemental Security Income ("SSI") on December 3, 1984, alleging that he had been disabled since August 2, 1982, due to cardiomyopathy, degenerative heart disease, detached retina in the left eye, a thyroid condition, an ulcer, alcohol dependence, depressive reaction, mixed neurotic character disorder and somatization disorder. The Secretary denied his application on initial review.

Subsequently, the Secretary re-evaluated his claim pursuant to new regulations regarding mental impairments in Section 5 of the Social Security Disability Benefits Reform Act of 1984, Pub.L.No. 98–460, 98 Stat. 1794. The Secretary denied his application initially and on reconsideration. After a *de novo* hearing held on July 27, 1988, the Administrative Law Judge ("ALJ") determined that Mr. Jackman was disabled as of January 7, 1987 primarily due to alcohol dependence and various mental impairments. On January 6, 1987, Donald J. Coleman, M.D., a psychiatrist hired by the Social Security Administration, examined Mr. Jackman. The following day, he recorded the evaluation, and the ALJ chose this date as the onset date for disability. Unfortunately, Mr. Jackman's disability insurance status had expired one week earlier on December 31, 1986, and thus he was not entitled to disability insurance benefits. However, the ALJ's finding entitled him to an SSI award.

The Appeals Council declined to review the ALJ's decision, and this appeal followed. Conceding that he did not have a physical impairment which would have limited his ability to work before December 31, 1986, Mr. Jackman has confined his appeal to the issue of whether his alcoholism and mental impairments precluded him from working before December 31, 1986. Accordingly, the Court will consider only the evidence of record pertaining to Mr. Jackman's alcohol abuse and mental status.

## II. FACTS

Mr. Jackman, a high school graduate who has completed 3 years of college, is presently 47 years old, married and the father of 7 children. T.28, 29, 34. From 1971 until 1981, Mr. Jackman worked for Goodyear Wholesale Tire Sales as a shipper/receiver. T.29. Mr. Jackman testified that during the entire length of his employment, he had difficulty with his supervisor. T.36. Regarding his supervisor he stated, "I think the man was obnoxious. I think he was—I would consider him an idiot. He had no regard for people's integrity. He was a liar." *Id.* In April, 1981, Goodyear fired him because of a dispute he had with his supervisor regarding his demand to be excused for Good Friday religious observances. T.35–36. Mr. Jackman has not worked since this time.

Mr. Jackman suffers from chronic alcoholism. He has been alcohol dependent for at least 10 years, reportedly consuming between 4 to 6 cans of beer each day since he was eighteen years old. T.222, 274. When he first worked at Goodyear in 1971, he drank between 3 and 4 cans of beer each day. By the late seventies or early eighties, his consumption had increased to 5 cans each day, and in 1983, he started drinking 9 sixteen ounce bottles each day, which is his current consumption level. T.50. Mr. Jackman explained that his drinking substantially increased in 1983 because, "I got depressed, got between (sic) on the work. I started drinking more. That's when I started isolating and it's been gradually growing, growing and growing." *Id.*

Mr. Jackman has suffered a number of physical impairments related to his alcohol abuse over the past 7 years, and numerous physicians have repeatedly warned him to quit drinking. On May 23, 1983, Mr. Jackman was admitted to the Eye & Ear hospital with a detached retina to his left eye. T.274. During his stay at the hospital, his doctor discovered that he suffered from cardiomyopathy. *Id.* Noting that Mr. Jackman was an alcoholic, his doctor opined that his enlarged heart was probably due to his prolonged and excessive drinking. *Id.*

In September and October of 1984, Mr. Jackman visited the University of Pittsburgh Falk Clinic ("Falk Clinic") on several occasions complaining of nausea, vomiting, weight loss, abdominal pain and diarrhea. T.226–31. During these visits, his doctor observed that Mr. Jackman suffered from chronic anxiety and alcohol abuse. T.226–31.

As a result, on October 10, 1984, he was admitted to the Presbyterian–University hospital for a liver biopsy, panendoscopy and barium enema. T.271. He was diagnosed as suffering from alcohol abuse, alcoholic liver disease with sclerosing hyaline necrosis and mild fatty change, and anemia. He was treated with medication and advised to enter an alcohol treatment program. T.272.

On September 10, 1985, Mr. Jackman suffered an acute asthmatic attack and received treatment from St. John's General hospital. During a follow-up examination at Falk Clinic, he was counseled to decrease or eliminate his use of alcohol. T.217. On September 21, 1985, Mr. Jackman re-entered the hospital with pneumonia, diagnosed as possible Legionnaires Disease. T.283, 311. During a follow-up examination at Falk Clinic on December 3, 1985, Mr. Jackman's doctor, Robert Ruffner, M.D., reported that he had decreased his alcohol intake to 0 to 4 beers each day. T.214.

Mr. Jackman continued with his routine physical examinations at Falk Clinic during 1986. In March, 1986, Dr. Ruffner stated that Mr. Jackman's alcohol consumption

was 0 to 6 beers each day, but that in general he had maintained a decreased level of drinking, averaging 10 beers a week. T.209. In June, his physician noted that he suffered from chronic diarrhea and suspected that this condition was due to alcoholism. T.197, 201. He stated that Mr. Jackman's beer consumption had increased again to 3 to 5 beers each day. T.201. In July, August and September, Dr. Ruffner reported that Mr. Jackman's diarrhea and alcoholism persisted and recommended that he quit drinking beer. T.192–94.

During a disability interview guide for mental impairment claims on November 14, 1986, Mr. Jackman stated that he has trouble sleeping at night, and that he spends most of his day "lying on the couch, watching the kids and worrying." T.100. Commenting on his social life, Mr. Jackman remarked that he does not visit relatives or friends and that he does not want friends or relatives visiting him. T.102. He repeated these similar feelings during his disability hearing stating, "I have trouble with everybody. I don't associate with people. I stay away from them. I don't go out of the house. I have trouble with my children. I have trouble with my wife. I want to be by myself." T.43. The interviewer at the disability interview noted that Mr. Jackman had unusual difficulty remembering information needed to complete the disability claim, and that he was confused during the interview. T.107.

On December 4, 1986, Richard Rosenbloom, M.D., examined Mr. Jackman at the request of the Social Security Administration. T.341. Dr. Rosenbloom reported that Mr. Jackman had been depressed for the previous 5 years, and had a history of alcohol abuse. T.342–43. Noting that Mr. Jackman was consuming 6 to 7 bottles of beer each day, Dr. Rosenbloom's overall impression was that Mr. Jackman suffered from alcoholism and depression. T.341, 343.

Mr. Jackman has undergone routine mental health counseling since 1978. T.394. Newton C. Gardner, Ph.D., M.A., treated Mr. Jackman weekly for approximately 6 months in 1978–1979 at Northern Communities Mental Health and Retardation. *Id.* In 1979, Dr. Gardner terminated his employment with Northern Communities Mental Health and Retardation, and referred Mr. Jackman to John Bair, Ph.D. From 1979 until 1982, Dr. Bair treated Mr. Jackman at Psychological Services of Pittsburgh. Dr. Bair retired in 1982, and Mr. Jackman sought counseling from the Catholic Diocese. Mr. Jackman returned to Dr. Gardner, who was in private practice, for 4 visits in July, 1984. However, due to Mr. Jackman's inability to pay for private service, Dr. Gardner discontinued treating Mr. Jackman in 1984 and referred him to the Community Mental Health program. *Id.*

Dr. Gardner submitted to the Bureau of Disability Determination a mental health evaluation of Mr. Jackman that he completed on December 23, 1986. T.363. He diagnosed Mr. Jackman as suffering from a dysthymic disorder, continuous alcohol dependency and passive and immature personality traits since 1976. T.365. During his last examination of the plaintiff in 1984, Dr. Gardner observed that Mr. Jackman's appearance was clean, his speech was spontaneous, and his mood was agitated and depressed. *Id.* He had good memory, and he did not experience hallucinations or illusions. Dr. Gardner felt that Mr. Jackman's impulse control fluctuated from poor to good. T.366. He had good social judgment, but his insight was fair to poor. T.367. Dr. Gardner opined that Mr. Jackman's prognosis was poor to fair with counseling. *Id.*

In the area of social functioning, Dr. Gardner wrote that Mr. Jackman's ability to get along with others was poor. He explained that Mr. Jackman views himself as being superior to others. In addition, Dr. Gardner opined that Mr. Jackman had poor ability to initiate social contacts, and below average interest and participation in group activities. T.369. He had poor ability to interact with co-workers and the public, and had difficulty with criticism. *Id.*

His concentration and task persistence was good, and his ability to sustain a routine was good for limited periods. T.370. Commenting on Mr. Jackman's ability to

perform at a consistent pace, Dr. Gardner stated that he would require periodic rest periods because his health has deteriorated due to inactivity and alcohol dependence. *Id.*

In the area of adaptation to stressful circumstances, Dr. Gardner wrote that Mr. Jackman had poor ability to adapt to changes because of his low self esteem, and his reaction to conflict was anxiety, agitation and interrealization. T.371. His ability to make decisions was fair to poor, and his awareness of normal hazards and ability to take precautions was good. *Id.*

At the Secretary's request, Donald J. Coleman, M.D., a psychiatrist, evaluated Mr. Jackman on January 6, 1987. T.353. He diagnosed Mr. Jackman as suffering from continuous alcohol dependence, chronic depressive reaction which was mild to moderate and mixed neurotic character disorder. T.357. In addition, he indicated that Mr. Jackman had a somatization disorder, as he channeled stress into his stomach and respiratory and cardiac systems. *Id.* Dr. Coleman opined that the patient's prognosis for recovery was poor. *Id.*

Dr. Coleman felt that Mr. Jackman was capable of the activities of daily living such as cleaning, shopping and cooking so long as he remained sober. T.359. In the area of social functioning, Dr. Coleman wrote that Mr. Jackman's ability to get along with others was unimpaired, but that his interaction with persons in authority was characterized by ambivalence. T.360. His concentration and task persistence was unimpaired, but his adaptation to stressful circumstances was poor. T.361–62. Dr. Coleman felt that Mr. Jackman had poor insight, and that he "uses a good bit of denial and wanted to know if I thought he was an alcoholic." T.357.

Dr. Gardner re-evaluated Mr. Jackman on February 11, 1987. T.395. Dr. Gardner remarked that Mr. Jackman has good hygiene, and that he is intelligent. T.398. However, he noted that Mr. Jackman is "chronically depressed, has periodic bouts with feelings of worthlessness to which he reacts with swings from acute depression and withdrawal to anger and verbal ag-

gressive outbursts at himself and occasionally his wife and children." *Id.* Dr. Gardner further opined that Mr. Jackman absorbs his unchanneled agitation and anxiety into his stomach and heart. *Id.*

Noting that Mr. Jackman "sees himself as increasingly helpless in an increasingly hostile world," Dr. Gardner concluded that Mr. Jackman is "excessively wary and cautious to the point where his ability to perform could be impaired severely." T.399. Dr. Gardner confirmed his diagnosis in his December, 1986 report that Mr. Jackman suffers from continuous alcohol dependence with an onset date of the late 1970's, dysthymic disorder, and personality disorder traits of avoidant personality and passive-aggressive. T.400.

Dr. Gardner commented on Mr. Jackman's need to recognize the severity of his alcohol dependence, and indicated that he would have to quit drinking before he could deal with his emotional problems. *Id.* Dr. Gardner opined that Mr. Jackman could not sustain any daily work activity for more than a few weeks, mostly due to his low morale and alcoholism. *Id.*

## III. DISCUSSION

### A. *Definition of Disability*

To receive disability benefits, the claimant must be adjudged disabled. 42 U.S.C. 423(a)(1)(C). A claimant is disabled if he is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

Initially, the claimant must make a *prima facie* showing of an impairment which precludes him from performing his past work. The Secretary then has the burden of demonstrating that the claimant has the capacity to perform alternative jobs, considering his age, education and work experience. *Gilliand v. Heckler,* 786 F.2d 178, 180 (3d Cir.1986).

To clarify and formalize the adjudicative process, the Social Security Administration

has promulgated regulations which establish a five-step evaluation process to determine whether a claimant is disabled. 20 C.F.R. 404.1520(a). If at any point in the process the ALJ determines that the claimant is or is not disabled, the inquiry must end. *Id.*

The analysis requires the ALJ to decide: 1) whether the claimant is currently engaged in substantial gainful employment; 2) if not, whether the claimant has a severe impairment; 3) if he does have a severe impairment, whether the impairment meets or equals one of the impairments listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1; 4) if it does not, whether the claimant's impairment prevents him from performing his past relevant work; and 5) if his impairment does prevent him from performing his past job, whether the claimant is able to engage in other forms of substantial gainful activity, considering his age, education, prior work experience and residual functional capacity. The claim is approved if the claimant cannot perform other kinds of work. 20 C.F.R. 404.1520.

The medical vocational guidelines are used to determine whether the claimant is disabled if the ALJ reaches the fifth step in the evaluation process. 20 C.F.R., Pts. 404–416, Subpts. P, I, App. 2. To use the guidelines, the ALJ must make findings of fact regarding the claimant's age, education and work experience. 20 C.F.R. 404.1568, 416.960–68. In addition, the ALJ must assess the claimant's residual functional capacity. 20 C.F.R. 404.1545, 416.-945.

However, when a claimant presents evidence of both exertional and nonexertional (mental, sensory or skin) impairments, the guidelines are inapplicable, and the ALJ must make findings of fact regarding the extent to which the nonexertional limitations diminish the claimant's work ability. 20 C.F.R. 404.1545, 416.945. In addition, the ALJ must identify specific jobs that the claimant is capable of performing. 20 C.F.R. 404.1520(f), 416.9210(f). This finding is preferably done with the assistance of vocational expert testimony.

Although the five-step evaluation process applies to both physical and mental impairments, the regulations require the ALJ to follow a special procedure to evaluate the severity of mental impairments. 20 C.F.R. 404.1520(a), 416.910(a). First, the ALJ must review the mental status examinations and psychiatric history of the claimant to determine whether a mental impairment exists. *Id.* If the ALJ finds the existence of a mental impairment, the second step requires her to determine the severity of the impairment as it affects the claimant's ability to work. *Id.* The Social Security Administration assesses the severity by the degree to which the impairment imposes functional limitations on the claimant's ability to work. *Id.*

The regulations identify four areas of function which are considered essential to the ability to work: activities of daily living; social functioning; concentration, persistence and pace; and, deterioration or decompensation in work or work-like settings. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ must rate the degree of limitation in each of the four functions to determine whether the impairment is severe. 20 C.F.R. 404.1520a(c), 416.920a(c). If the mental impairment is severe, the ALJ must then decide whether it meets or equals a listed mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ will determine that the claimant is disabled if the mental impairment is a listed mental disorder and at least two of the functional criteria have been limited. *Id.* If it does not meet a listed mental disorder, the ALJ must perform a residual functional capacity assessment to determine whether the claimant can perform some jobs notwithstanding his mental impairment. 20 C.F.R. 404.-1520a(c)(3), 416.920a(c)(3).

B. *Standard of Review*

In reviewing the Secretary's decision to deny Mr. Jackman benefits, we must decide whether the Secretary applied the correct legal standards, and whether his findings of fact are supported by substantial evidence. *Brown v. Bowen,* 845 F.2d 1211, 1213 (3d Cir.1988). The United States Court of Appeals for the Third Circuit de-

fines substantial evidence as "such relevant evidence as a reasoning mind might accept as adequate to support a conclusion." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.1981).

## C. *Analysis*

■ After reviewing the medical evidence in the record, the ALJ held that Mr. Jackman's alcoholism and mental impairments did not become disabling until January 7, 1987, six days after Mr. Jackman's disability insurance status expired. Thus, Mr. Jackman was ineligible for disability insurance benefits. According to the ALJ, she picked January 7, 1987 as the disability onset date because on this date Mr. Jackman's conditions "began to show significant deterioration." T.12.

The Secretary concedes, however, that the ALJ picked this onset date because this was the date that the psychiatrist, Dr. Coleman, prepared an evaluation of Mr. Jackman's mental status. Government's Brief, at 9. According to the Secretary, although this date is somewhat arbitrary, this was the first date that objective medical evidence existed confirming Mr. Jackman's mental impairments. *Id.*, at 9. Mr. Jackman argues that this date is illogical and arbitrary and is not supported by substantial evidence.

We agree. A review of the medical record clearly establishes that Mr. Jackman's mental impairments became disabling long before January 7, 1987. The ALJ accepted the opinion of the psychiatrist, Dr. Coleman, that the combination of Mr. Jackman's mental impairments and alcoholism was disabling. However, she incorrectly chose the onset date as that date in which the doctor recorded his evaluation of Mr. Jackman.

Dr. Coleman stated that Mr. Jackman suffered from, *inter alia*, continuous alcohol dependence. This contradicts the ALJ's assertion that Mr. Jackman's disabling mental impairments manifested themselves for the first time during his visit with Dr. Coleman. The arbitrariness of the ALJ's selection of January 7, 1987 as the disability onset date is highlighted by the fact that Dr. Coleman actually examined Mr. Jackman on January 6, 1987; January 7 was the date that the doctor prepared the report of the examination. Thus, according to the ALJ's analysis, Mr. Jackman's mental impairments became disabling not on the day of, but on the day after, his first psychiatric examination. This result, of course, is untenable. *See McWilliams v. Bowen*, 674 F.Supp. 12, 13 (W.D.Pa.1987) ("Unlike a traumatic injury, a mental impairment such as depression does not arise full grown on the day the patient sees the doctor....").

Moreover, objective evidence exists in the record establishing an onset date earlier than January 7, 1987. Mr. Jackman has been an alcoholic for at least 10 years, and a number of medical reports indicate that he may well have been alcohol dependent since he was 18 years old. T.222, 274. The record demonstrates that Mr. Jackman has been in a state of denial regarding his alcoholism, and that he has been unable to control his addiction. Although he attempted to decrease and/or eliminate his beer consumption in 1984, he failed and within a few months he was drinking 8 to 10 beers daily. T.283, 201. He has suffered a number of related physical symptoms associated with alcoholism, namely cardiomyopathy and liver disease, and Mr. Jackman was first hospitalized with these symptoms in 1983.

Regarding Mr. Jackman's mental impairments, the ALJ completely ignored Dr. Gardner's December 23, 1986 report documenting Mr. Jackman's mental health condition in 1984, the date Dr. Gardner had last treated the plaintiff. Dr. Gardner diagnosed Mr. Jackman as suffering from dysthymic disorder, continuous alcohol dependence and passive and immature personality traits. We note that Dr. Coleman rendered the same diagnosis of the plaintiff in 1987.

In the area of activities of daily living, Dr. Gardner thought that Mr. Jackman had good ability, but in the areas of social functioning and adaptation to stressful circumstances, he had poor ability. T.368–71. In the area of concentration and task per-

sistence, Dr. Gardner rated Mr. Jackman's overall ability as good, but he noted that Mr. Jackman's ability to sustain a routine would be only good for limited periods, his ability to make decisions was fair, and he could not perform at a consistent pace. T.370. Mr. Jackman had poor to fair insight, and his prognosis for recovery was poor to fair with counseling. T.367.

■ The opinion of a claimant's treating physician is entitled to substantial weight if it is supported by clinical or laboratory findings. *Butler v. Secretary of Health and Human Services*, 543 F.Supp. 979, 980 (S.D.Ohio 1982). In addition, the Secretary is free to choose between properly submitted medical opinions or reject a medical opinion that is contradicted by other evidence in the record. However, he must give an explanation of the reasons why he rejected probative evidence, so that a reviewing court can determine whether the rejection was proper. *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir.1981).

Dr. Gardner's medical opinion establishes that in 1984, Mr. Jackman suffered from severe listed mental disorders, and that in at least two areas of function, social functioning and deterioration or decompensation in work or work-like settings, Mr. Jackman was limited. Accordingly, pursuant to the regulations, the ALJ should have made a finding of disability as of this date.

However, the Secretary failed to consider Dr. Gardner's opinion regarding the status of Mr. Jackman's mental health in 1984. In addition, the Secretary ignored Mr. Jackman's testimony and various medical reports which established an onset date of 1984. This failure to consider uncontroverted medical evidence was improper.

Mr. Jackman testified during both his 1988 hearing and 1986 disability interview that his depression and drinking increased in 1983. T.50, 102. During this time he started isolating himself from his family and friends. *Id.* Moreover, in September and October, 1984, Mr. Jackman's physician started noting in his medical records that Mr. Jackman was suffering from chronic anxiety. T.226–31. On December 4, 1986, Richard Rosenbloom, M.D., examined Mr.

Jackman and reported that he had suffered from depression for the past 5 years. Finally, between 1983 and 1985, Mr. Jackman was hospitalized on at least 3 occasions, suffering from alcoholism and alcohol-related physical impairments. T.272, 274.

The Secretary's decision that Mr. Jackman became disabled on January 7, 1987 is not supported by substantial evidence because the ALJ ignored uncontroverted medical evidence. The record clearly establishes that Mr. Jackman's mental impairments became disabling before January 7, 1987, and the objective medical evidence indicates that by August 1984 his conditions had deteriorated to the point where they rendered him disabled. Accordingly, the Secretary's determination denying disability insurance benefits is reversed, and we will enter judgment in favor of the plaintiff and award disability benefits beginning August 1, 1984.

An appropriate Order will issue.