Terry L. ANTHONY, Plaintiff

v.

Louis W. SULLIVAN, M.D., Secretary
of Health and Human Services,
Defendant.

Civ. A. No. 90–184 Erie.

United States District Court,
W.D. Pennsylvania.

Oct. 6, 1992.

Howard Morrison, Northwestern Legal Services, Franklin, Pa., for plaintiff.

Albert W. Schollaert, Asst. U.S. Atty., Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

MENCER, District Judge.

This case is before us on appeal from a final decision by the defendant Secretary of

Health and Human Services denying the plaintiff Terry L. Anthony's claim for disability insurance benefits and Supplemental Security Income. The parties have submitted cross motions for summary judgment.

## I. PROCEDURAL HISTORY

On November 15, 1988, the plaintiff, Mr. Anthony, applied for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under, respectively, Title II and Title XVI of the Social Security Act. *See* 42 U.S.C.A. §§ 401–433, 1381–1383c (West 1991 & 1992). He alleged mental and nervous impairments, later adding that a physical impairment made him unable to work in temperatures exceeding 75 degrees. After initial denial and denial on reconsideration, the claimant requested a hearing. A hearing was held before an Administrative Law Judge ("ALJ") on October 12, 1989, and the ALJ affirmed the denial of the claimant's DIB and SSI benefits in a decision dated December 6, 1989. The Appeals Council denied review on August 9, 1990, and the claimant commenced a civil action in the District Court for the Western District of Pennsylvania.

After a dispute regarding this court's resumption of jurisdiction was resolved in the plaintiff's favor, on April 4, 1991, we denied both plaintiff's and defendant's motions for summary judgment. Instead, the court entered an Order remanding the case to the Secretary for further proceedings. The remand was made to permit an opportunity for a vocational expert to assess the effect of the claimant's non-exertional limitations upon his potential occupational base.

A supplemental hearing was held on July 26, 1991, before a second ALJ. The only witnesses were Mr. Anthony and a vocational expert, Mr. William Book. On August 23, 1991, the ALJ issued a decision concluding that Mr. Anthony was not eligible for DIB and not entitled to SSI.

## II. FACTS

Mr. Anthony was born on June 23, 1953, and is currently 39 years old. He graduated from high school and then completed a two-year program to attain a commercial and fine arts certificate. Mr. Anthony's marriage ended in divorce more than a decade ago. He has a young child, who lives elsewhere. Prior to his work at Polk State Hospital, Mr. Anthony worked for three months as an orderly at another hospital.

At Polk State Hospital, he worked for eleven years, from November 4, 1974 to September 28, 1985, as an aide to the mentally retarded. On the job, Mr. Anthony had duties including waking and dressing the mentally retarded, feeding them, taking them on trips and providing other recreation. The job also included some teaching of the mentally retarded and a good deal of paper work.

Between February 1976 and June 1981, Mr. Anthony was hospitalized for periods of up to several months for mental disturbances. After each hospitalization, he returned to his job at Polk State Hospital. At his initial hearing in 1989, Mr. Anthony explained the circumstances of his departure from Polk State Hospital on September 28, 1985, the date he claims he became unable to work:

Q: Why did you leave there?

A: I guess my nerves got to me. You know, I had the breakdown and decided to—just left because I even called them up and told them I quit. I didn't even go back.

Q: Well, what symptoms were you having at the time?

A: Oh, I don't know. I was—well, I was involved with cocaine and it made me want—I just didn't care, I guess, anymore about it. And the girl I was seeing out there, she was having a baby at the same time and it had a lot to do with it.

Mr. Anthony was also drinking an excessive amount of alcohol during that period.

The record shows that in 1976, the year of Mr. Anthony's first hospitalization, Dr. John Rightor, a general practitioner who has been Mr. Anthony's family physician since 1967, began treating his nervous condition with valium. Mr. Anthony continues

to take a daily dose of valium to calm his nerves, however, he has not undergone regular psychiatric or psychological evaluations or counseling since September 1985.

After leaving Polk State Hospital, he worked for several days as an attendant to an elderly gentleman, who was not satisfied with Mr. Anthony's performance. In 1988, he attended Edinboro University for about a month, working on campus as a painter for eleven hours a week to offset tuition. He left the University because "the pace or something was too fast."

On September 7, 1989, Dr. Rightor made a note that Mr. Anthony's drug and alcohol use were under control. Mr. Anthony reported that he had stopped using drugs and stopped drinking alcohol because he had "accepted Jesus Christ."

Recently, Mr. Anthony has lived with his mother. He helps with her five dogs and with chores around the house. He has received welfare benefits and foodstamps. He tends to be reclusive, but attends church regularly and paints pictures as a hobby.

### III.  MEDICAL EVIDENCE

A review of the medical evidence shows that Mr. Anthony was hospitalized on five occasions between February, 1976, and June, 1981, all for paranoid schizophrenic reactions. His first hospitalization occurred February 8, 1976. On admittance, he was exhibiting marked delusional symptoms and bizarre inappropriate behavior. A psychiatrist, Dr. J.B. Johnston, reported that plaintiff "had many delusions of persecution in which the people at work would be trying to harm him." He felt that people at work were in some way exercising mind-control and trying to influence his decisions. Dr. Johnston noted that Mr. Anthony's psychotic state "could possibly be thought of as drug-induced," but plaintiff denied the use of drugs. He was discharged February 23, 1976.

Mr. Anthony was hospitalized a second time on March 31, 1976. Dr. Johnston observed that Mr. Anthony was extremely upset and completely inappropriate, was having hallucinations and was extremely bizarre, and had many feelings of persecution, including ideations that his co-workers were trying to harm him. His psychotic condition stabilized with medication, and the patient "went into rather severe depression with marked feelings of worthlessness and hopelessness." Dr. Johnston noted that "there is some question on the part of the family regarding drug involvement but this was never confirmed." Plaintiff was discharged April 21, 1976.

On September 2, 1979, Mr. Anthony was again admitted to the hospital with bizarre behavior, hallucinations, delusions, feelings of persecution, and grandiose feelings. He was discharged on October 3, 1979.

Mr. Anthony was next brought to the hospital on April 29, 1980, in a state of acute psychosis. Dr. Johnston again reported marked delusions, hallucinations, feelings of persecution and grossly inappropriate conversations. Mr. Anthony was "completely out of contact with his surroundings. He was unable to function in any capacity." He was discharged on June 7, 1980.

Mr. Anthony's fifth and final psychiatric hospitalization was on June 30, 1981. He was found by police wandering in Clarion, Pa., and was involuntarily admitted to the Oil City Hospital for mental treatment. Hallucinations, delusions of persecution, and bizarre thought patterns were again reported. Dr. Johnston observed that "he continually talked about the powers that were bothering him and the fact that his mind was being controlled." Dr. Johnston also recorded the following:

> This individual has a long history of emotional difficulties, but functions well for periods of time, then for some apparent reason begins to slip. The hallucinations and delusions reappear; the bizarre thought patterns start to control his actions and he is very noticeable because of his behavior. This results in his being hospitalized.

Mr. Anthony returned to his job at Polk State Hospital, and worked another four years before leaving for the reasons on which he bases his claim for benefits. Al-

though he initially denied use of drugs other than marijuana prior to his hospitalizations, Mr. Anthony subsequently has admitted using cocaine and abusing alcohol during that period, confirming the suspicions of hospital staffmembers regarding his symptoms.

The medical record demonstrates that Mr. Anthony's alcohol and drug abuse problems are now fully in remission. His treating physician, Dr. Rightor, has found that although Mr. Anthony is at times quite insecure and handles stress poorly, he is also intelligent, stable, trainable and employable.

In 1989, Dr. Rightor assessed Mr. Anthony's psychological ability to do work-related activities on forms supplied by the Secretary. He concluded that Mr. Anthony had a "good" ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, maintain attention and concentration, behave in an emotionally stable manner, and understand, remember and carry out complex, detailed and simple job instructions. He also found, however, that Mr. Anthony had only a "fair" ability to deal with work stresses and function independently.

In his testimony, Mr. Anthony said noise causes him stress. Going out in public or being around people also causes him stress. Sometimes he's afraid to go out of his house. Conflict causes him stress. Mr. Anthony reacts to stress by losing his ability to concentrate. At times, he has to read a newspaper three or four times to understand it. In a letter dated Feb. 3, 1989, claimant wrote, "[E]ven though my nervous condition is stable with medication I still am not able to understand, remember, and follow basic instructions and perform routine tasks independently on a *consistent* level, at times I am very *erratic.*"

Dr. Rightor noted that Mr. Anthony is quite a dependent person and insecure; that his reaction to conflict is probably flight; he is insecure and tends to shun decisions and conflicts; that emotionally he does not have a very good feeling about himself and is quite insecure; and that his

nervousness is controlled in the absence of tension.

Assessing Mr. Anthony on forms supplied by the Secretary in 1989, Dr. Rightor indicated that Mr. Anthony "handles stress poorly," but is otherwise qualified to work. Mr. Anthony concurs with Dr. Rightor's determination that he has no exertional limitations. However, Mr. Anthony has disagreed with Dr. Rightor's assessment of environmental conditions limiting where the claimant could work. Mr. Anthony said at the supplemental hearing that his tolerance to heat and humidity had decreased since he had a "heat stroke" in May 1984. He said that when the temperature is over 75 degrees, he now experiences weakness and lightheadedness. Mr. Anthony told the ALJ he had not yet discussed his heat sensitivity problem with Dr. Rightor.

## IV. DISCUSSION

### A. Standard of Review

To receive disability benefits, the Secretary must adjudge the claimant disabled. *See* 42 U.S.C. § 423(a)(1)(C). A claimant is disabled if he is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Secretary has adopted a five-step sequential evaluation process for the determination of disability. *See* 20 C.F.R. § 404.1520. In the instant case, the Secretary made the following determinations through the fourth step: (1) claimant has not engaged in substantial gainful activity since September 28, 1985; (2) claimant suffers from an impairment which has imposed significant functional limitations for more than 12 continuous months; (3) claimant does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4; and (4) claimant is unable to perform his past relevant work.

■ Once a claimant makes a *prima facie* showing of an impairment which precludes him from performing his past relevant work, the burden shifts to the Secretary to show an ability to do other work. *Bowen v. Yuckert*, 482 U.S. 137, 147, n. 5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987). This constitutes the fifth step of the sequential evaluation process. In this case, both ALJs who have handled Mr. Anthony's application for benefits have concluded that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. Consequently, at the fifth step of the evaluation, the ALJ was required to perform a residual functional capacity assessment to determine whether Mr. Anthony could perform certain jobs notwithstanding his mental impairment. *See* 20 C.F.R. §§ 404.-1520(f), 416.920a(c)(3).

It was on this subject that this court remanded the case for testimony by a vocational expert. We called for the Secretary to provide substantial, rather than speculative evidence that Mr. Anthony's impairment did not significantly proscribe his occupational base of work at all exertional levels. We called for competent evidence in line with the directives of Social Security Ruling 85–15, which states that:

> Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, co-workers, and usual work situations, and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education,

or work experience will not offset such a severely limited occupational base.

Social Security Ruling 85–15.

■ In reviewing the Secretary's decision to deny benefits to the plaintiff, we must decide: (1) whether the Secretary applied the correct legal standards; and (2) whether the Secretary's findings of fact are supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir.1988). The United States Court of Appeals for the Third Circuit has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.1981). If the Secretary applied the correct legal standards and if his findings of fact are supported by substantial evidence, then we must affirm his decision to deny disability benefits.

On his motion for summary judgment, Mr. Anthony requests a reversal of the Secretary's determination on the ground that it is not supported by substantial evidence. Specifically, the plaintiff contends that the vocational expert's testimony did not constitute substantial evidence so as to rebut the medical evidence of his disability. The Secretary, in support of his own motion for summary judgment, argues that the ALJ's decision is supported by substantial evidence.

### B. The ALJ's Findings and Decision

■ In his opinion following the supplemental hearing, the ALJ found that other jobs exist in significant numbers in the national economy which the claimant could perform consistent with his medical impairment, functional limitations, age, education, and work experience. He found that Mr. Anthony has an unlimited residual functional capacity except for work involving temperatures over 75 degrees as well as work requiring high levels of stress or critical independent decisionmaking.

Mr. Anthony alleges no exertional impairments, and the ALJ concluded that Mr. Anthony's psychotic breaks were related to his now-admitted drug abuse and that he

does not suffer from a psychotic disorder. According to the ALJ, Mr. Anthony's mental impairment, although significant, does not approach the severity of any listed in Appendix 1, Subpart P, Regulations No. 4.

Based upon a review of the record as a whole as well as the testimony provided by the vocational expert, the ALJ found that Mr. Anthony's non-exertional impairment does not significantly compromise his ability to perform the unskilled, entry level work required by an orderly or nurse's aide. Consequently, the ALJ concluded that Mr. Anthony can be expected to make a vocational adjustment to work which exists in the significant numbers in the economy. Accordingly, the ALJ found that Mr. Anthony was not under a "disability" as defined in the Social Security Act. *See* 20 CFR §§ 404.1520(f), 416.920(f).

Mr. Anthony was represented at his supplemental hearing by Howard Morrison, a paralegal who also represented him at his initial hearing. To fully appreciate the nature of the ALJ's line of questioning, we quote at length from the transcript of the supplemental hearing. The ALJ posed questions to the vocational expert, William Book, as follows:

Q: Mr. Book, please review the claimant's past relevant work and define these jobs as to exertional and skill level.

A: Okay. His past relevant work includes an aide to the mentally retarded. This is classified as medium level work, the *Dictionary of Occupational Titles* Number 355.377–014.

Q: Did he acquire any particular skills in this work, Mr. Book?

A: The aide position is classified as unskilled labor, sir.

Q: Mr. Book, given the claimant's age, education and work experience, and assuming that he has no exertional limitations other than an intolerance for heat above 75 degrees, can he perform his past relevant work?

A: Yes, sir, on an exertional basis. Yes, sir.

Q: Assume further, Mr. Book, that this claimant or a claimant with the claimant's given age—this claimant's given age, education and work experience, and assuming again that he has a full range—a full residual functional capacity for a full range of work at any exertional limit with the exception of the heat, but has the following nonexertional limitations, that he finds it difficult to handle stress and that he finds himself, in his words, nervous. Can he, sir, perform his past relevant work with that limitation?

A: Yes, depending upon the way the stressful situation—as long it's handled in an appropriate manner as to fit within the guidelines of the job.

Q: Assume, sir, the same facts as given before, are there any other entry-level jobs that this man could perform?

A: Okay. Another position that, that would be somewhat related would be an orderly, a nurse's aide position, and that would be also classified under the medium level classification of work, with an estimated number of 6,871 jobs available in the State of Pennsylvania.

Q: Assume, Mr. Book, please, for the purposes of this hypothetical question a person of the same age, education and background, and assume further the exertional limitation that I have described with regard to a temperature limit, and assume further the nonexertional limitation which I have suggested in the previous question, that he finds it difficult to handle stressful work, now further, if you please, add to that hypothetical question that this claimant finds himself insecure and tends to shun decisions in conflicts with co-workers and others. Would that have any bearing upon his ability to do the work that you have described as an orderly?

A: As long as, as the feelings that he had didn't preclude him from acting appropriately, functioning in the job he would be able to, to perform his duties.

The claimant's representative, Mr. Morrison, followed-up on the ALJ's line of inquiry. Mr. Morrison emphasized that the hypothetical worker was "nervous, difficult to handle stress, insecure, tends to shun decisions in conflicts with co-workers and others and has a limited ability to make

critical independent decision-making." Asked if these characteristics would have a negative impact on his ability to perform work as an orderly or a nurse's aide, the vocational expert responded that it would, "depending on the level of supervision that was, was immediately available." The vocational expert later added:

> But generally, my experience with, with the jobs are that the, the critical decision making is usually made at a different, different level by someone with more, more qualification or a different job description.

In this appeal, Mr. Anthony alleges that the hypothetical questions posed at the supplemental hearing failed to accurately depict all his impairment related limitations of function. He complains that the hypothetical questions did not fully reflect his reactions to stress such as his deficiencies in concentration and inability to follow simple instructions or to perform routine tasks. Additionally, he claims that the ALJ failed to include the stress provoking conditions such as noise, being in public, being rushed, and conflict in his hypothetical questions to the vocational expert.

We reject Mr. Anthony's criticism of the hypothetical line of questioning, finding that the questions sufficiently portrayed the nature and extent of Mr. Anthony's impairment as contained in the record. In accordance with Third Circuit law, hypothetical questions posed by the ALJ to a vocational expert must accurately portray the claimant's functional limitations. "A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir.1987).

Any doubts regarding the substantiality of the vocational expert's testimony must be resolved in favor of the Secretary based on the testimony of Mr. Anthony himself, who spoke immediately before the vocational expert and in the vocational expert's presence. In response to questions, Mr. Anthony exhibited an ability to make critical independent decisions which indicated that he retained the level of decision-making ability required to perform the occupations identified by the vocational expert. Mr. Anthony testified, for example, that if he were a clerk in a store, he would have no difficulty determining whether a customer's demand was baseless. In another example, Mr. Anthony's representative asked him what he would do if he were a parts inspector and a crucial machine broke. Mr. Anthony answered that he would notify a repair person to fix the machine. When asked whether he would notify a repair person in Baltimore or New York, Mr. Anthony replied that he would notify whoever was closest to where he was. Asked whether he would notify a repair person whom he had been advised was not good, Mr. Anthony answered in the negative. As the Secretary has observed, Mr. Anthony's responses to this series of hypothetical questions reasonably suggests an ability to make independent decisions compatible with the degree required in the occupations of orderly and nurse's aide.

Furthermore, Mr. Anthony's responses to questions from the ALJ regarding stress-inducing situations support a finding that he is not disabled:

Q: Could you tell me, Mr. Anthony, how you react to instructions given to you by your superiors in a work environment? I give you an example, if you have a foreman who asks you to do a particular job, perhaps that job is not one that you'd care to do or you thought it should be given to someone else, how would you react to an instruction of that kind?

A: Maybe try to do it the best I could.

Q: Would you find it stressful, the fact that you were instructed to do something that you would rather not do?

A: Oh, no, sir.

Q: Sir?

A: No, sir.

Mr. Anthony answered reasonably, and sometimes astutely, certain questions regarding potential work situations that might produce tension. Despite his claim that being rushed caused him stress, Mr.

Anthony testified that he would have no trouble handling a reasonable production quota on an assembly line provided "it wasn't too fast-paced." If a problem arose with a co-worker, Mr. Anthony indicated he would handle it in a reasonable way:

Q: Suppose a co-worker became argumentative over the work that you and he were doing, what would be your reaction to that situation with a person that you were working with?

A: Probably to try to ignore it—ignore him or her.

Q: Would you confront that person directly and point out your position?

A: I don't think so.

Q: Would you be apt to leave the place of conflict—

A: Yes, sir, that's probably what I would do.

Despite the character of his responses above, on appeal Mr. Anthony maintains that there is no substantial evidence to support the Secretary's finding that he can perform alternative work. He asserts that the vocational expert's testimony is contrary to that finding and maintains that he is incapable of performing the jobs identified by the vocational expert. Mr. Anthony bases his conclusion on the potential for stress in these positions, and the possibility that adequate supervision would not be immediately available.

This case was remanded for taking of evidence in accordance with Social Security Ruling 85–15. The Ruling classifies as disabled anyone who can not meet the basic mental demands of unskilled work, including the ability on a sustained basis to understand, carry out, and remember simple instructions, to respond appropriately to supervision, co-workers, and usual work situations, and to deal with changes in a routine work setting.

Because we find that substantial evidence on the present record supports a finding by the Secretary that Mr. Anthony is not disabled within the meaning of the Act, we affirm the denial of benefits.