**Mary SMITH, (a fictitious designation), Plaintiff,**

**v.**

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**Civil Action No. 94–2506 (AJL).**

United States District Court, D. New Jersey.

Dec. 5, 1995.

Paul J. Schmidt, Boonton, New Jersey, for Plaintiff.

Faith S. Hochberg, United States Attorney, Janet S. Nolan, Special Assistant U.S. Attorney, U.S. Department of Justice, Newark, New Jersey, for Defendant.

## OPINION

LECHNER, District Judge.

This is an action brought under section 205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. § 405(g), to appeal the final determination of the Secretary of Health and Human Services (the "Secretary") denying the application of plaintiff Mary Smith [1] ("Smith") for disability insurance benefits.[2] Jurisdiction is alleged pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, this matter is remanded for further proceedings consistent with this opinion.

*Procedural History*

On 1 August 1992, Smith filed an application (the "Application") for disability insurance benefits under the Act, alleging disability due to severe multiple sclerosis. Tr. at 54. The Secretary initially denied the Application; Smith filed a request for reconsideration on 1 October 1992. *Id.* at 57. The Secretary denied the request for reconsideration on 18 November 1992. *Id.* at 59. On 4 January 1993, Smith filed a request for a review of the Application by an administrative law judge ("ALJ"). *Id.* at 60.

Administrative Law Judge Irving Fliegler ("ALJ Fliegler") held a hearing (the "Hearing") on 15 September 1993. Tr. at 25. On 24 September 1993, ALJ Fliegler rendered his decision, determining that Smith was not entitled to disability benefits because she did not satisfy the insured status requirements under the Act. *Id.* at 15. On 24 November 1993 Smith requested the Appeals Council of the Social Security Administration's Office of Hearings and Appeals (the "Appeals Council") review ALJ Fliegler's decision. *Id.* at 4.

1. The designation "Mary Smith" is used to shield the identity of the plaintiff. The original of this opinion and accompanying order are filed under seal. The only difference between this opinion and the original is the use of the plaintiff's name in the original.

2. In support of her appeal, Smith submitted: Plaintiff's Brief (the "Moving Brief"); Plaintiff's Supplemental Brief (the "Reply Brief").

In opposition to the appeal of Smith, the Secretary submitted: Defendant's Brief Pursuant to General Rule 48. The Transcript of the Administrative Record (the "Tr.") was also considered.

As of the date of this Letter–Opinion, the Joint Document of Stipulated and Disputed Facts and the Medical Abstracts, both of which must be submitted under Local Rule 48, have not been received.

In a notice, dated 28 March 1994 (the "Appeals Council Notice"), the Appeals Council denied Smith's request to review ALJ Fliegler's decision. *Id.* at 2–3. Because the Appeals Council denied review, ALJ Fliegler's decision became the final decision of the Secretary. *See* 20 C.F.R. § 404.981.

Smith now seeks judicial review of the Secretary's determination. As stated, the Appeals Council Notice denying review of ALJ Fliegler's decision is stamped "MAR 28 1994." Tr. at 2. Pursuant to 42 U.S.C. § 405(g), Smith could appeal ALJ Fliegler's decision by filing a claim within sixty days after the mailing of the Appeals Council Notice. Smith timely filed a complaint with the clerk of the court on 27 May 1994. *See* 42 U.S.C. § 405(g).[3] Thereafter, the parties filed their submissions.

The issue in this case is whether Smith, who alleges she signed under duress inaccurate tax returns filed jointly with her husband, may submit to the Secretary proof of self-employment income in the form of amended tax returns filed after the deadlines promulgated by Congress and the Secretary. If the Secretary accepts such untimely-submitted amended tax returns as proof of Smith's income, she would have the opportunity to meet the insured status requirements under the Act and, if successful, could then receive disability insurance benefits upon a showing that she was "disabled," as that term is defined in the Act.

*Facts*

A. *Background and Hearing Testimony of Smith*

Smith is a forty-nine year old mother of three children. Moving Brief at 2. In 1971, at the age of twenty-five, she became a registered nurse and married. *Id.;* Tr. at 31. After the birth of her three children Smith stopped working to raise her children. Moving Brief at 2.

Smith stated that two or three years into her marriage it became apparent to her that her "husband ha[d] a drinking problem." Tr. at 31. Her husband began to behave in an emotionally abusive manner. This emotional abuse included "verbal abuses, . . . put downs and . . . humiliations and . . . degrading remarks and everything." *Id.* She stated her husband first became physically violent in 1974, about three or four years after they were married. *Id.* at 31–32. Smith stated that, on one occasion, she and her husband were in their car when Mr. Smith began "hollering" at her. Smith testified that he then struck her leg hard enough to leave a three-inch by four-inch bruise, which made walking difficult. Smith stated that her husband then "put his fingers through [her] hair on [the] left side of [her] head and then banged [her] head into the car window on the passenger side." *Id.* at 32.

Smith stated such physical abuse was only the first of many violent attacks upon her. She stated that her husband has also punched her in the nose, which caused her to lose consciousness, and he has also repeatedly pushed and slapped her and thrown objects at her. Tr. at 41.

Smith stated: "I am in fear of my life because I am—when I am in bed, I can't get up and run out to be safe. I told the kids that if they ever see Daddy come upstairs with a shotgun or something, I said, get yourselves out of the house. Go to the neighbors and call the police." Tr. at 48.

Smith also stated that her husband physically and emotionally abused their children. Tr. at 32. Smith stated:

> My oldest son, Frank, Frank, he would always ask "When is Daddy coming home? When's Daddy coming home?" And I thought, and I thought he missed his father. But now that he's grown now, he's almost 22. He says "Yeah, I used to ask that because I was so scared when Daddy was coming home. . . ." He said "I'd be climbing up the ladder [of his bunk bed] trying to get away and he'd be, you know, punching me, hitting me . . . ."

---

**3.** Under Rule 6 of the Federal Rules of Civil Procedure, the date the Appeals Council Notice was mailed should not be included in determining whether Smith met the sixty-day limit under 42 U.S.C. § 405(g). Accordingly, it appears Smith filed the complaint exactly sixty days from the date the Secretary mailed the Appeals Council Notice.

*Id.* at 32–33. Smith stated that child abuse in her home continued until the children reached the eighth grade. *Id.*

Smith stated that she returned to nursing in 1981. She continued working as a self-employed nurse until late 1983, when the onset of multiple sclerosis began to cause her difficulty working. Tr. at 32–33. Smith worked intermittently from late 1983 until May 1986, when her multiple sclerosis became too acute for her to work. *Id.*

Smith and her husband jointly filed tax returns for the years 1983 and 1984 (the "Original Returns"). They did not report any of Smith's self-employment income on the Original Returns. Moving Brief at 3. On 5 October 1988, Smith and her husband jointly filed 1040X Amended Income Tax Returns which reflected Smith's self-employment income for 1983 and 1984 (the "Amended Returns"). Tr. at 77, 91. As Smith concedes, the Amended Returns were filed after the limitations period set out by Congress in the United States Code and by the Secretary in the Code of Federal Regulations. Moving Brief at 4.

Smith alleges that her husband forced her to sign the Original Returns. Smith stated that her husband exercised economic control over her by physical and emotional abuse. "The economic control [was] unbelievable." Tr. at 46. "[She] wasn't allowed to touch the [Original Returns].... The only time [she] got to touch the paper was when [her husband] would bring it, stick it under [her] face, and say—bang his finger into the table or wherever, 'sign it, sign it'." *Id.* at 33–34. Smith told her husband that "[she] want[ed] to look through [the Original Returns]," but he did not allow her to do so. *Id.* at 34. He told her that she was "numb from the neck up" and "wouldn't understand it." *Id.* Smith testified that "[she was] not even allowed to use the checkbook [at that time]." *Id.* at 46.

Smith explained that she needs to obtain disability insurance benefits in order to leave her husband. She has become physically dependent upon him as her multiple sclerosis has grown more severe. "[She is] physically dependent upon him because [she] ha[s] to have an adult with [her]. [She] cannot stand at this point.... And so [she is] stuck." Tr. at 46. In her request for a hearing before an ALJ, Smith stated that she is unable to eat by herself because she cannot hold a knife or fork. *Id.* at 19. Smith also stated that she needs help getting in and out of bed. *Id.* Counsel stated that her husband " 'throws' her from the chair to the bed or from the bed to the chair." Reply Brief at 2. In fear of reprisal from her husband, Smith has requested that all correspondence relating to the instant matter be sent directly to her attorney. Tr. at 8.[4]

Smith stated that she first learned that she did not meet the insured status requirements of the Act when the Application was rejected. Tr. at 37.

### B. *Testimony of Leigh A. Davis*

ALJ Fliegler heard the testimony of Ms. Leigh A. Davis ("Davis"), the coordinator of the community outreach program of the Jersey Battered Women's Service ("JBWS"). Davis holds a master's degree in psychology from the New School of Social Research. Tr. at 39.

Davis stated that, in February 1991, Smith was "referred by her physician who had asked her directly if she was in an abusive relationship. She told him 'yes.' He asked her if she would like to contact [JBWS] and she contacted [Davis] for counseling." Tr. at 40. Davis stated that, at the time of the Hearing, she had been counseling Smith for more than two years. *Id.* at 40.

Davis diagnosed Smith as depressed as a result of involvement in a long-term abusive relationship. Tr. at 42. Davis stated that the "first incident of abuse occurred in 1974. Her husband grabbed her by the hair and banged her head against the car window." *Id.* at 40–41. Davis testified to a history of abuse which "ran the gambit from physical and emotional, including intimidation." *Id.* at 40. According to Davis, Smith was

---

4.    It is because of this request that the fictitious designation "Mary Smith" is used in this opinion to identify the plaintiff. *See supra* n. 1.

"punched in the knee," "punched in the nose," and subjected to "pushing, slapping and [the] throwing [of] objects." *Id.* at 41. When Smith attempted to escape her husband by locking herself in a bathroom, her husband banged on the door "until it splintered." *Id.* at 41.

Davis stated that, in addition to physical abuse, Smith also suffered from "verbal and emotional abuse including isolation, economic control, name calling, ridicule, humiliation and harassment." Tr. at 41.

Davis stated that Smith was "coerced to sign tax forms which is also typical of relationships where there's economic control as part of the abusive pattern." Tr. at 41. According to Davis, long-term abuse of Smith led to an emotional condition which prevented her from attempting to discuss with her husband any of the tax forms at issue. *Id.* at 43. Smith was "obviously afraid of her husband because of the threats he had made." *Id.* at 41. "He would say to her, 'I can't explain this to you. You would never understand it. Just sign the form'. She was really not in a position to challenge him." *Id.* at 43. Smith was "afraid to speak up because there is always that chance that the husband will become violent. The threat of violence is always there." *Id.*

Davis stated that economic control is very common among battered women. Davis explained that, during the three years that she worked at JBWS, she counseled more than 500 women and "about two thirds of the women experience economic control where they really have absolutely no idea what's going on with the money. Men hide financial statements. That kind of thing. And just really not tell (sic) the women what's going on." Tr. at 43–44.

Davis stated that women do not challenge an abusive partner over economic control because "[i]f they have challenged the men in the past, what they may get is either physically assaulted or verbally assaulted. So you learn over time if you challenge your partner about things that he wants control of, that you're probably going to get hurt either physically or emotionally." Tr. at 44.

In addition to the testimony summarized above, ALJ Fliegler received a report, by Davis, on behalf of JBWS, dated 22 February 1991 (the "Report"). Tr. at 94–95. The Report corroborates much of the testimony Davis provided at the Hearing. The Report stated that Smith was referred to JBWS by her physician after Smith reported abuse by her husband. *Id.* at 94. The Report stated that Smith has long a history of physical, verbal and emotional abuse by her husband. *Id.* "Mr. Smith's abusive behavior has also included pushing, slapping, threats with a weapon and throwing objects." *Id.*

The Report stated Mr. Smith's abusive behavior served to maintain his power and control in the relationship, particularly his "economic control" over Smith. Tr. at 95. The Report concluded that this economic control bears directly on what was described as "the crux of this particular case—the claimant's late filing of tax returns." *Id.* The Report stated that Smith was frightened to ask her husband to allow her to review the Original Returns because when she asked about them in the past, her husband ridiculed her and also prevented any such review. The Report stated that Smith was completely unaware of what income was declared to the Internal Revenue Service on the Original Returns. The Report concluded: "[T]he threat of violence, whether overt or implied, is enough to maintain the women's silence." *Id.*

Counsel for Smith explained to ALJ Fliegler that he sought leave to submit the Amended Returns to establish Smith's eligibility for disability insurance benefits, despite the fact that such submissions were untimely under governing law and regulations. ALJ Fliegler explained that he lacked "the authority to … bypass … those regulations, no matter the circumstances." Tr. at 29. ALJ Fliegler explained to Smith that her only opportunity "to get relief … [was] in a … Federal district court." *Id.* at 44.

The record also contains copies of Smith's earnings records, Tr. at 63–68, and copies of the Original Returns and Amended Returns. *Id.* at 69–93.

*Discussion*

### A. *Applicable Law*

■■■■ A review of a final decision of the Secretary is made pursuant to 42 U.S.C. § 405(g).[5] *See Ventura v. Shalala,* 55 F.3d 900, 901 (3d Cir.1995). Section 405(g) permits a district court to review transcripts and records upon which a determination of the Secretary is based. If supported by substantial evidence, the Secretary's factual findings of disability must be accepted as conclusive. *Ventura,* 55 F.3d at 901; *Williams v. Sullivan,* 970 F.2d 1178, 1182 (3d Cir.1992), *cert. denied,* 507 U.S. 924, 113 S.Ct. 1294, 122 L.Ed.2d 685 (1993); *Woody v. Secretary,* 859 F.2d 1156, 1159 (3d Cir.1988). Although factual findings of an ALJ are upheld if supported by substantial evidence, the standard of review is plenary as to conclusions of law. *Snyder v. Shalala,* 44 F.3d 896, 898 (10th Cir.1995) ("If the ALJ failed to apply the proper legal test, reversal is appropriate"); *Holman v. Califano,* 835 F.2d 1056, 1058 n. 3 (3d Cir.1987).

An individual must be insured to qualify for disability insurance benefits under the Act. 42 U.S.C. § 423(a)(1)(A). A claimant has disability insured status under the act if she is "fully insured" and also has "at least 20 [quarters of coverage] in the 40 quarter period ... [preceding a disability]." 20 C.F.R. § 404.130(b); *see* 42 U.S.C. § 423(c)(1)(B)(i). "A quarter of coverage (QC) is the basic unit of social security coverage used in determining a worker's insured status. [The Secretary] credit[s an applicant] with QCs based on [the applicant's] earnings covered under social security." 20 C.F.R. § 404.140(a). "Quarters" and "Quarters of Coverage" are defined under 42 U.S.C. § 413(a). The criteria for determining whether a self-employed individual has earned Quarters of Coverage are different than the criteria for determining whether a wage-earner has earned Quarters of Coverage. *See* 42 U.S.C. §§ 412 and 413(a)(2). The instant matter does not turn on the definition of a Quarter of Coverage; at issue is the deadline for submitting proof of self-employment earnings in order to be credited with sufficient Quarters of Coverage to qualify for disability insurance benefits.

The Secretary is required to maintain records indicating wages and self-employment income earned by claimants. 42 U.S.C. § 405(c)(2)(A). During the limitations period of three years, three months and fifteen days following the end of any calendar year, *see* 42 U.S.C. § 405(c)(1)(B); 20 C.F.R. § 404.802, a claimant may submit material to correct any errors in the Secretary's records concerning wages or self-employment, whether of inclusion or omission. 42 U.S.C. § 405(c)(4). Following the end of the limitation period, the Secretary's records as to an individual's wages or self-employment income for a given year "shall be conclusive...." 42 U.S.C. § 405(c)(4)(A). "[T]he absence of an entry" in the Secretary's records "as to the wages alleged to have been paid by an employer to an individual during any period in such year shall be presumptive evidence ... that no such alleged wages were paid to such individual in such period." 42 U.S.C. § 405(c)(4)(B).

> [T]he absence of an entry in the [Secretary's] records as to the self-employment income alleged to have been derived by an individual in such year shall be conclusive ... that no such alleged self-employment income was derived by such individual in such year unless it is shown that he [or she] filed a tax return of his [or her] self-employment income for such year before the expiration of the time limitation following such year....

42 U.S.C. § 405(c)(4)(C); *see also* 20 C.F.R. § 404.822(b)(2)(ii). Although there are ten exceptions to these limitations, *see* 42 U.S.C. § 405(c)(5)(A)–(J), none applies in the instant matter.

The limitations period has been characterized as a "'statute[ ] of limitation[s] ... to guard against false claims after contradictory evidence is unavailable.'" *Shore v. Califano,* 589 F.2d 1232, 1237 n. 11 (3d Cir.1978) (quot-

---

**5.** Section 405(g) provides in pertinent part: Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action....
42 U.S.C. § 405(g).

ing *Breeden v. Weinberger,* 493 F.2d 1002, 1006 (4th Cir.1974)); *see Rand v. Sullivan,* 924 F.2d 159, 162 (9th Cir.1990). Congress adopted a more rigorous standard of proof for the self-employed than for wage-earners because it was concerned that self-employed claimants might be tempted to submit stale or manufactured evidence of their incomes.

> The conclusive presumption protects the government from spurious or merely inaccurate and unverifiable claims based on after-the-fact evidence.... Because self-employed workers control the reporting of their income without the check of employers' also reporting their wages to IRS, Congress saw fit to impose a stricter standard for amendment of their [Social Security] records.

*Hollman v. HHS,* 696 F.2d 13, 17 (2d Cir. 1982). There is an additional reason that the Secretary subjects wage-earners to a less rigorous standard of proof than the self-employed. Wage-earners must rely upon their employers to report their income. Congress and the Secretary sought to ensure that employees are not penalized for the "negligence of their employers who had failed to report wage payments." *Shore,* 589 F.2d at 1237. "This concern is not relevant to self-employed claimants, however, inasmuch as self-employed claimants control and are responsible for their own income tax and social security reporting." *Id.*

Prior to 1950, the self-employed were not insured under the Act, because of a concern for a lack of a reliable method of reporting self-employment income. *Weisbraut v. Secretary,* 757 F.2d 83, 85 (3d Cir.), *cert. denied,* 474 U.S. 852, 106 S.Ct. 152, 88 L.Ed.2d 125 (1985); *Shore,* 589 F.2d at 1238. Reliance on income tax returns was regarded as the only administratively workable plan for accurately recording the income of self-employed workers for Social Security purposes. *Weisbraut,* 757 F.2d at 85; *Shore,* 589 F.2d at 1238. Accordingly, the Third Circuit has "felt

bound to take a very strict view" of this rule. *Weisbraut,* 757 F.2d at 85; *accord Burke v. Secretary,* 680 F.2d 1128, 1130 (6th Cir.1982); *Yoder v. Harris,* 650 F.2d 1170, 1172–73 (10th Cir.1981).

**B.** *Findings of ALJ Fliegler*

ALJ Fliegler observed that, to meet the insured status requirements under 20 C.F.R. § 404.130, a claimant must earn at least twenty Quarters of Coverage in a forty-quarter period. ALJ Fliegler concluded that Smith had earned only fifteen[6] Quarters of Coverage during the forty-quarter period ending on the date she alleges she became disabled. Tr. at 13. Accordingly, ALJ Fliegler denied the Application for failure to meet the insured status requirements of the Act. *Id.* at 14, 15.

ALJ Fliegler found that the Amended Returns were not timely filed. Tr. at 14 (citing 20 C.F.R. §§ 404.803(c)(3); 404.822(b)(2)). ALJ Fliegler also determined that Smith's "failure to report her self-employment income on a timely basis resulted from extenuating circumstances well beyond her control." *Id.* Although ALJ Fliegler was "sympathetic to [Smith's] situation ... [he determined he was] bound by the provisions of the Social Security Act and its attendant regulations" and he denied the Application. *Id.*

**C.** *Analysis of ALJ Fliegler's Decision*

■ After a review of facts and the law in the instant matter, it appears ALJ Fliegler correctly interpreted the relevant statutes and Federal regulations. Smith seeks to use the Amended Returns as evidence. Tr. at 77–93 (Amended Returns and proof of payment). The Amended Returns are dated 5 October 1988. Tr. at 77, 91. Smith had three years, three months and fifteen days after the end of calendar years 1983 and 1984 to correct the Secretary's records of her income for those years. 42 U.S.C. § 405(c)(1)(B); 20 C.F.R. § 404.802. Be-

---

**6.** Smith alleges she has earned seventeen Quarters of Coverage without accounting for the Amended Returns. Moving Brief at 4. Smith has not stated, and it is not apparent, how many additional Quarters of Coverage would be available to her if the Secretary accepted the Amended Returns as evidence of

her income. This Letter–Opinion makes no determination of how many Quarters of Coverage Smith has earned in the forty months preceding the onset of her alleged disability after including the Amended Returns, that conclusion is left to the Secretary upon remand.

cause the Amended Returns were submitted after that deadline, a conclusive presumption arose that the Secretary's records of Smith's income, as reflected in the Original Returns, filed in 1983 and 1984, were correct. 42 U.S.C. § 405(c)(4)(C); 20 C.F.R. § 404.822.

Smith seeks an equitable remedy. "The Plaintiff begs ... that this court exercise its equitable powers and reverse the decision of the defendant...." Reply Brief at 3. "The issue is not whether the Plaintiff submitted the appropriate forms and payment within the time limit. She did not. She did not because she could not." Moving Brief at 4–5.

### D. *Equitable Remedies*

Smith argues that "[a] District Court is vested with equity powers and, while it may not intrude upon the administrative process, it may adjust its relief to the demands of the case in accordance with the equitable principles governing judicial action." Reply Brief at 2.

The time limit on filing tax returns as evidence of self-employment income in 42 U.S.C. § 405(c)(4)(C) is a " 'statute[ ] of limitation[s].' " *Shore,* 589 F.2d at 1237 n. 11 (quoting *Breeden,* 493 F.2d at 1006).

"Federal statutes of limitations are generally subject to equitable tolling." *Doherty v. Teamsters Pension Trust Fund,* 16 F.3d 1386, 1393 (3d Cir.1994) (citing *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95–96, 111 S.Ct. 453, 457–58, 112 L.Ed.2d 435 (1990); *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946); *Central States, S.E. & S.W. Areas Pension Fund v. Slotky,* 956 F.2d 1369, 1376 (7th Cir.1992)). The Supreme Court has specifically authorized equitable tolling of statutes of limitations in exigent circumstances in the Social Security context. *Bowen v. City of New York,* 476 U.S. 467, 480, 106 S.Ct. 2022, 2030, 90 L.Ed.2d 462 (1986). *Bowen* was a class-action lawsuit against the Secretary, alleging that plaintiffs had been denied benefits under an illegal internal policy of the Secretary.

In *Bowen,* some members of the plaintiff-class had filed for judicial review more than sixty days after final decisions of the Secretary, notwithstanding the deadline set out in 42 U.S.C. § 405(g). The *Bowen* Court characterized the sixty-day deadline under 42 U.S.C. § 405(g) as a statute of limitations. 476 U.S. at 478, 106 S.Ct. at 2029 (citing *Mathews v. Eldridge,* 424 U.S. 319, 328 n. 9, 96 S.Ct. 893, 899 n. 9, 47 L.Ed.2d 18 (1976); *Weinberger v. Salfi,* 422 U.S. 749, 764, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975)). The Court concluded that "the equities in favor of tolling [the sixty-day limitation] are compelling," *id.,* 476 U.S. at 480, 106 S.Ct. at 2030, because " 'the Government's secretive conduct prevent[ed] plaintiffs from knowing of a violation of [their] rights.' " *Id.* at 481, 106 S.Ct. at 2030 (quoting *City of New York v. Heckler,* 742 F.2d 729, 738 (2d Cir.1984)).

The equitable concerns that motivated the *Bowen* Court to toll the sixty-day limitations period under 42 U.S.C. § 405(g) justify tolling the limitations period set out in 42 U.S.C. § 405(c)(4)(C). The failure of Smith to report her self-employment income was a consequence of circumstances beyond her control. While the *Bowen* Court considered the sixty-day requirement in § 405(g) as a statute of limitations, it observed that it was contained "in a statute that Congress designed to be 'unusually protective' of claimants." 476 U.S. at 467, 106 S.Ct. at 2022 (citation omitted). It further observed that Congress expressed a clear intention to allow tolling in some cases. *Id.* The Court noted that "the Secretary may grant an extension where a suit was not timely filed because of an illness, accident, destruction of records, or mistake." *Id.* at n. 12. This reasoning is equally applicable in a § 405(c)(4)(C) situation, as presented by Smith.

The Amended Returns were not filed in a timely manner because of the inability of Smith to do so as a consequence of spousal abuse. This conduct prevented her from reviewing the Original Returns and justifies tolling of the limitation period until such time as she had a reasonable opportunity to learn of the facts and take corrective action. Tolling in this case best effects the purposes of the Act.

As discussed, the records of the self-employed are conclusively deemed correct because the self-employed usually are solely

**160**

responsible for the reporting of their income. In this case, although self-employed, Smith lacked control over the completion and filing of the Original Returns. In these circumstances, it is inappropriate for the Secretary to presume conclusively that her records of income for Smith, based upon the Original Returns, are correct.

On the facts in this case, the equities favoring tolling are compelling. This matter is remanded and the Secretary is instructed to consider the facts surrounding Smith's circumstances, and the abuse she suffered, to determine the period appropriate for tolling the statute of limitations. If the Secretary determines, after tolling the statute, that the Amended Returns were timely filed, she is to then consider the Amended Returns in determining Smith's Quarters of Coverage and eligibility for disability benefits.

*Conclusion*

For the foregoing reasons, the decision of ALJ Fliegler is remanded for further proceedings consistent with this opinion.